Filed 5/21/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B253141 |
| Plaintiff and Respondent, | (Super. Ct. No. 1410916) |
| | (Santa Barbara County) |
| v. | |
| TIMOTHY SEAN MCNALLY, | |
| Defendant and Appellant. | |

We recently said that "firearms and poor judgment do not mix." (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1045.) This is such a case. Appellant, a federal correctional peace officer used poor judgment with his firearm resulting in the death of a fellow federal correctional peace officer. The jury found that he acted with implied malice and convicted him of second degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] with special findings that he personally used a firearm within the meaning of sections 12022.5, subdivision (a) and 12022.53, subdivision (b).) The trial court sentenced appellant to prison for 15 years to life plus 10 years on the firearm enhancement.

Appellant contends: The conviction is not supported by the evidence, there were evidentiary and instructional errors, the trial court abused its discretion in denying his request to release juror identifying information after the verdict was

---

[1] Unless otherwise stated, all statutory references are to the Penal Code.

entered, and the prosecutor misstated the law of "accident" in closing argument. We affirm.

*Facts*

On the evening of March 8, 2012, appellant and his friend, Gary Bent, drank beer and ingested bath salts (a "designer drug" known as MDVP which mimics the effects of cocaine and methamphetamine). Before doing so, Bent attended a riot control training session at a hotel in Lompoc. After they "partied," appellant and Bent went to Bent's hotel room. Bent felt sick, sat on the edge of the bathtub, and said he was about to throw up. Appellant called Bent a "sissy" and decided to play a joke. Appellant took his loaded Springfield Armory XD nine millimeter pistol out of its holster and waived it at Bent. The pistol had a live round in the chamber. The pistol had several safety features. All safeties had to be released to fire the pistol. Holding the pistol like a TV gangster, appellant ordered Bent to "Hurry up and puke." Bent told him to "Fuck off" just before appellant shot him. The bullet struck Bent in the neck, severing his jugular vein.

Rather than administer CPR or call for help, appellant smoked a cigarette, paced around the room, and tossed the spent shell casing in the bathtub where Bent lay. Appellant sent Sonia Reynolds the following text message: "Damn. I just shot my friend in the damn neck. He's fucking dead as fuck. Whoops." Reynolds asked if he was serious. Appellant texted back: "Yep. Dammit. Why the fuck was I fucking around with that damn loaded fucking gun?" Richard asked if appellant had called an ambulance. Appellant texted: "No. He's fucking dead. Why? Little late for that don't you think?" Before leaving the hotel, appellant texted that the shooting "really just fucked up my damn night." Richards reported the matter to the Lompoc Police Department.

Appellant went to his father's house and said that he had been drinking too much. Appellant was angry, waived the pistol in the air, and discharged the weapon again. The bullet went through the front door.

2

Appellant was arrested and waived his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694]).  He told Lompoc Police Department Agent Sergio Arias  that the shooting was "completely an accident. . . .  [W]e were drinking and fucking screwing around, I don't know how in the fuck I pulled the trigger."

Appellant had served seven years in the U.S. Army, knew about firearms, and was aware of all firearm safety rules.  As a corrections officer at the Lompoc Federal Prison, appellant received monthly training in firearm use and safety.

A forensic examination of appellant's blood showed the presence of bath salts (MDVP) and Vicodin but no alcohol.  High doses of bath salts can cause extreme anxiety, panic attacks, severe agitation, aggressive behavior, and combativeness.

Elpidio Garcia, a firearms instructor at the Lompoc Federal Prison, testified that he trained appellant in firearm use and safety.  Appellant took an advanced shooting course that included firearm safety and live firearms training.  Appellant also served on the Special Operations Response Team that dealt with hostage/lethal force situations and trained twice a month in firearm use and safety.  Garcia stated that appellant was trained to obey the following firearm safety rules on and off duty:  "All guns are always loaded.  Never let your muzzle cover anything you don't want to destroy   Keep your finger off the trigger until your sights are on the target.  And be sure of your target and what's beyond it."   The rules were intended to instill "muscle memory" so that appellant would know how to behave in stressful situations.  Appellant was trained to keep his index finger away from the trigger until the pistol was pointed at the target, not to drink or engage in horseplay when using a firearm, and to only draw his firearm when threatened.  Garcia testified that pointing a handgun at a person in a small room who is not a threat is a violation of the safety rules and dangerous.  "Range safety is not just at the range.  It's at your house.  It's

3

wherever you're going to carry that firearm. You need to always remember the potential dangers for mishandling, or misusing, mishandling a firearm."[2]

Appellant defended on the theory that the shooting was accidental. As a corrections officer, appellant carried a firearm for protection and usually had a round chambered in the pistol when "out and about." Appellant's ex-girlfriend stated that he carried a loaded pistol at all times.

Appellant testified that it was Bent's idea to buy the bath salts. The night before the shooting, they purchased an 18-pack of Bud Light beer and consumed the beer and bath salts in Bent's hotel room. Appellant spent the night partying, tried to work the next day without sleep, and returned to the hotel where he and Bent consumed more beer and bath salts.

Appellant then explained how he shot Brent. When Bent said that he was going to throw up, appellant thought it would be "funny" to grab the pistol and joke with Bent. Standing at the bathroom door, appellant held the pistol gangster style and pointed it at Bent. He did not believe that there was a bullet in the firing chamber. He called Bent a "sissy" and said: "Go ahead. Throw up." Brent said "Fuck off" and the pistol fired. Appellant was stunned and paced around, expecting the police to arrive. Before leaving, appellant found the expended shell casing and threw it in the bathtub where Bent's body lay.

*Sufficiency of the Evidence - Implied Malice*

---

[2] Although expressed differently by various experts and firearms' organizations, there are four cardinal rules of firearm safety: 1. Always treat all firearms as if they were loaded. 2. Never allow the muzzle of your firearm to point at anything you do not intend to shoot. 3. Keep your finger off the trigger until your sights are aligned with the target and you are ready to shoot. 4. Be sure of your target and its surroundings. (See e.g. the California Rifle and Pistol Association (www.crpa.org); see also *Perez v. City of Los Angeles* (2008) 167 Cal.App.4th 118, 124.) Based upon common sense and the expert testimony of Elpidio Garcia, we would add two more rules: 1. There is no joking or horseplay with firearms. 2. There is no alcohol and/or drug use with firearms.

Appellant contends that the evidence does not support the finding that he acted with implied malice, a requisite element of second degree murder. As in any sufficiency-of-the-evidence case, we review the record in the light most favorable to the prosecution and draw all reasonable inferences in support of the judgment. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Brown* (2014) 59 Cal.4th 86, 105-106.) We do not reweigh the evidence or reassess the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there substantial evidence to support the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Murder is the unlawful killing of a human being with malice aforethought and requires express or implied malice. (§§ 187, subd. (a); 188.) Implied malice may be proven by circumstantial evidence and has both a physical and mental component. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) The physical component is satisfied by the performance of an act, the natural consequences of which are dangerous to life. (*Ibid.*) The mental component is established where the defendant knows that his conduct endangers the life of another and acts with conscious disregard for life. (*Ibid.*)

It is settled that brandishing a loaded firearm at a person is an act dangerous to human life. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 109-110; *People v. Tohia* (1959) 167 Cal.App.2d 39, 46.) Appellant pointed the loaded pistol at Bent, "overrode" the safeties, and pulled the trigger. Based on his extensive training in firearm safety, the jury reasonably inferred that appellant knew it was a highly dangerous act and acted in conscious disregard for life. (*People v. Thomas* (2012) 53 Cal.4th 771, 814-815.) "Even if the act results in a death that is accidental, as defendant contends was the case here, the circumstances surrounding the act may evince implied malice. [Citations.]" (*People v. Nieto Benitez, supra,* 4 Cal.4th at p. 110.)

5

Appellant argues that accidental firearm discharges rarely result in great bodily injury or death and do not create a probable risk of harm to human life. Appellant's firearm's instructor, Elpidio Garcia, testified that there is a difference between an "accidental discharge" and a "negligent discharge" where the shooter is doing something he or she should not be doing with the firearm. Appellant brandished the loaded pistol and pointed it at Bent. The jury was instructed that the killing is an accident if appellant "was doing a lawful act in a lawful way" and "acting with usual and ordinary caution." (CALCRIM 510.) There is no evidence that appellant was doing a lawful act in a lawful way. Appellant's intentional act of pointing a loaded pistol at the victim was, at the least, negligent. It was dangerous to human life. The natural and probable consequences of the act created a probable risk of harm. Appellant's claim that the pistol went off accidentally does not negate implied malice. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1359.)

Appellant argues that implied malice requires subjective awareness of the risk created. (See *People v. Watson* (1981) 30 Cal.3d 290, 298.) Appellant had such awareness. He was knowledgeable about firearms and firearm safety, was trained to keep his index finger off the trigger, and was trained to assume that "guns are always loaded." It is uncontroverted that appellant ignored all the handgun safety rules and had been drinking and using drugs when he brandished the pistol. Appellant admitted that he "broke the golden rule" not to point a firearm "[a]t anything you don't want to destroy" and that his finger somehow "squeezed the fucking trigger."

In *People v. Boatman* (2013) 221 Cal.App.4th 1253 defendant teased his girlfriend by pointing a handgun at her face and inadvertently shot her. Defendant told the police that he "knew the gun was loaded and intentionally cocked the hammer back, albeit 'jokingly'; the hammer slipped, causing the gun to fire and kill [the girlfriend]." (*Id.*, at p. 1263.) The Court of Appeal held that the evidence supported the conviction for implied malice, second degree murder. "The jury could have easily concluded that pointing a loaded gun at someone and pulling the hammer back is an intentional act, the natural consequences of which are dangerous to human life, and

6

that defendant deliberately did so with knowledge of such danger and with conscious disregard for [the victim's] life, even if, as defendant said, 'it was just all in play.' " (*Ibid.*) The same analysis applies here.

Based on appellant's training and experience with firearms, the reckless manner in which he pointed the pistol at Bent, his text messages and flight from the hotel, and his statement to the police, the jury could rationally find that he acted with implied malice. We hold as follows: A person acts with implied malice when he is under the influence of alcohol and/or drugs, engages in joking or horseplay with a firearm, and causes the discharge of the firearm killing another person.

Appellant argues that drunken horseplay does not establish malice. However, the evidence shows that appellant acted with conscious disregard for life and appreciated the risk involved. Unlike express malice, implied malice does not require wrongful intent. (*People v. Swain* (1996) 12 Cal.4th 593, 602-603.) "[T]he state of mind of a person who acts with conscious disregard for life [i.e., implied malice] is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.)

*Bath Salts Evidence*

Appellant argues that the trial court erred in admitting evidence that he snorted bath salts. Before trial, appellant moved to exclude the bath salts evidence on the theory that it was irrelevant and lacked probative value because there was no medical literature that "someone acts recklessly as an adverse effect of bath salts." (Evid. Code, § 352.)

The trial court did not abuse its discretion in ruling that the bath salts evidence was relevant and admissible to show state of mind. (*People v. Clark* (2011) 52 Cal.4th 856, 893.) An expert witness testified that someone snorting bath salts could have a "bad trip" and engage in violent or self-destructive behavior. Another expert testified that Vicodin, alcohol, and bath salts could impair a person's judgment and the effect would be exacerbated if the substances were taken at the same time. Appellant's ingestion of bath salts in combination with Vicodin and alcohol was

7

relevant to explain why he acted in conscious disregard for human life and pointed a loaded pistol at Bent. (*People v. Harris* (2013) 57 Cal.4th 899, 947; *People v. Dellinger* (1989) 49 Cal.3d 1212. 1219-1220.) The trial court did not err in finding that the probative value of the evidence substantially outweighed the potential for prejudice. (Evid. Code, § 352.)

Appellant complains that the bath salts evidence painted him as a "bad man" with a criminal disposition. He claims it was the first time he had used the drug. The prosecution did not argue that appellant was a habitual drug user or had used bath salts in the past. Appellant told the police that the shooting was "alcohol fueled" yet had no alcohol in his system when he was arrested. Appellant also claimed that his judgment was not impaired by alcohol or drugs, yet friends and coworkers testified that appellant and Bent were obviously intoxicated. The bath salts evidence was properly admitted to show appellant's state of mind.

Appellant contends that the bath salts evidence was so inflammatory that the jury did not even consider implied malice. This is speculation. The record shows that the jury focused on implied malice during deliberations. The jury asked the trial court clarify the phrase "intentionally committed an act" as used in CALCRIM 520: "Please clarify what is meant by 'an act.' Is it limited to the actual pulling of the trigger on the gun? Can it include the acts leading up to the pulling of the trigger, for example getting up from the chair, getting the gun from the holster, going to the bathroom door and waiving the gun at the victim? Must it include pulling the trigger?' The trial court instructed: "The act refers to the manner in which the gun was handled by the defendant at the bathroom door in relation to Mr. Bent.".

*Unredacted Video*

Appellant contends that the trial erred in denying his motion for mistrial after the prosecution played an unredacted video of the *Miranda* interview in which appellant said, "I got diagnosed Post-Traumatic Street Disorder from my time in the Service." Before trial, it was stipulated that PTSD would not be referenced or considered by the jury. At the close of the People's case in chief, a video of the

*Miranda* interview was played and the jury was provided a transcript of the redacted interview. The trial court instructed: "If what you hear differs from what you read, you're to rely on what you hear." Near the end of the video playback, the trial court noted that it "just heard something on the audio that's not in the transcript."[3]

The prosecutor admitted that the wrong video was played to the jury. Defense counsel acknowledged that it was an honest mistake but argued that the jury may think appellant was predisposed to recklessness. "I'm not claiming prosecutorial misconduct, but I am saying that [PTSD] evidence is now before the jury . . . and it could work to the prejudice of my client. . . ."

The trial court found that the playback of the unredacted video was an honest error and that a curative instruction would protect appellant's due process rights. "I don't find it rises to the level of derailing [appellant's] ability to have a fair trial." The trial court denied a motion for mistrial, gave a curative instruction, and directed the prosecution to play the redacted video in its entirety.

"Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854; see

---

[3] The following portion of the video was inadvertently played to the jury:

"[Agent] Arias: What kind of other stuff you got goin' on? I mean, do you have anger problems?

"McNally: I got diagnosed post-traumatic stress disorder from my time in the Service.

"[Agent] Arias: Yeah?

"McNally: And . . .

"[Agent] Arias: Does [it] make you get pissed off rather easily?

"McNally: I guess it could. That's not what happened last night.

"[Agent] Arias: No?

"Mcally: No. It was a stupid fuckin' accident."

9

*People v. Dement* (2011) 53 Cal.4th 1, 39-40.)  Based on the length of the video (40 minutes),  the trial court reasonably concluded that the fleeting reference to PTSD did not irreparably damage appellant's chances to receive a fair trial.  (*People v. Lewis* (2008) 43 Cal.4th 415, 501.)  "Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment, absent evidence to the contrary the error is deemed cured. [Citations.]" (*People v. Martin* (1983) 150 Cal.App.3d 148, 163.)

The jury was instructed to disregard the unredacted video and not consider "anything that you have previously seen on this exhibit."[4]  The admonition was sufficient to cure any potential prejudice.  (*People v. Price* (1991) 1 Cal.4th 324, 428.)  " 'It is only in the exceptional case that "the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.'  [Citation.]" (*People v. Allen* (1978) 77 Cal.App.3d  924, 935.)  Appellant makes no showing that unredacted video violated his due process rights or irreparably damaged his chances of receiving a fair trial.  (*People v. Bolden* (2002) 29 Cal.4th 515, 555 [mistrial denied based on brief reference to defendant's parole status; no due process violation];  *People v. Harris* (1994) 22 Cal.App.4th 1575, 1581 [same; overwhelming evidence of guilt].)

*Motion to Disclose Juror Identifying Information*

Appellant claims that the trial court abused its discretion in denying his request to release confidential juror identifying information for purposes of investigating possible juror misconduct.  (Code Civ. Proc., §§ 206, 237, subd. (b).)  During jury deliberations, the jury foreperson submitted the following note:

---

[4] The jury was admonished:  "Ladies and gentlemen, there was a problem with our video.  We are going to restart it.  We are going to ask that you now review the video from the beginning, setting aside anything that you have previously seen and not consider anything that you have previously seen on this exhibit.  The exhibit now is 122-B.  We are going to start it at this point and . . . you are instructed not to consider anything you've previously seen and we'll start it fresh from this beginning point."

"Yesterday afternoon, Juror No. 12 stated that he had done research on the Internet regarding the Springfield . . . [handgun]. We stopped him before he said anything else. However, after consideration of this matter last night, I am compelled to report this."

Juror No. 12 was questioned out of the presence of the other jurors and said that he read an internet blog that there was no thumb safety on a Springfield .45 caliber handgun.[5] Juror No. 12 tried to talk about the blog during deliberations but was stopped by the other jurors. After Juror No. 12 was questioned, the jury foreperson reported that Juror No. 12 "would not be well accepted among the rest of the jurors" for violating the court's instructions.

Appellant's trial attorney requested that Juror No. 12 be removed because he would "be an outcast in the jury [room] . . . . [T]hat would make it very difficult for [the jury] to have a fruitful discussion and keep open minds if they already have attitudes regarding Juror No. 12." The trial court excused Juror No. 12, replaced this juror with an alternate, and instructed the jury to begin deliberations anew and disregard all deliberations that occurred when Juror No. 12 was on the jury.

Five days after the jury returned the guilty verdict, defense counsel received a letter from former Juror No. 12 that the jury foreperson called for a preliminary vote before the jury deliberated on the evidence. The letter stated that the jury foreperson coerced the other jurors to get rid of Juror No. 12 after a secret "4, 4, and 4" preliminary vote was cast. "I voted not guilty . . . [and] the jury [f]or[e]man was determined to have a verdict by [October] 10th." In a follow up interview, Juror No. 12 told a defense investigator that the jury foreperson was "arguing too heavy" for a guilty verdict.

The trial court found: "There is nothing that points to misconduct in any part of the actual jury that returned the verdict for the Court to base a finding of good cause" for the release of juror identifying information. Defense counsel argued that

---

[5] This, of course, is a different firearm than that used by appellant even though it is made by the same manufacturer.

"without the ability to ask the other jurors" it was unknown whether Juror No. 12 was telling the truth. The trial court rejected the argument because "Juror No. 12 was not part of the jury that returned the verdict, so the bottom line really is that there is a supposition by the defendant that there was misconduct."

After a verdict is entered, a criminal defendant may "petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).) Code of Civil Procedure section 237, subdivision (b) provides that "[t]he petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." Absent a showing of good cause for the release of the information, the pubic interest in the integrity of the jury system and the jurors' right to privacy outweighs the defendant's interest in disclosure. (*People v. Avila, supra,* 38 Cal.4th at p. 604; *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096. )

The trial court found there were too many inconsistencies in Juror No. 12's letter to make a prima facie showing of juror misconduct. Juror No. 12 claimed the foreperson wanted him off the jury because he voted "not guilty" but the preliminary vote was anonymous. Juror No. 12 also said that the jury foreperson wanted a verdict by Thursday (October 10, 2013) so the jury would not have to come back weeks later. The jury, however, was told that it could deliberate on Friday (October 11) and the trial court and counsel made a contingency plan to deal with the possibility of a Friday verdict. After Juror No. 12 was replaced with the alternate juror on October 8 (Tuesday), the jury was instructed to begin deliberations anew and not consider anything discussed or deliberated upon before Juror No. 12 was removed. The jury returned its verdict on Thursday (October 10, 2013). It was polled and no juror stated that he or she was pressured to convict or return an early verdict.

Our Supreme Court has cautioned that requests to access confidential

12

juror records " 'should not be used as a "fishing expedition" to search for possible misconduct . . . .' " (*People v. Avila, supra,* 38 Cal.3d at p. 604.) Here the juror misconduct claim was speculative and based on the statements of a disgruntled ex-juror who violated the court's instructions. (CALCRIM 201.) Appellant did not make a prima facie showing that juror misconduct occurred after Juror No. 12 was removed. (Code Civ. Proc., § 237, subd. (b); *People v. Wilson* (1996) 43 Cal.App.4th 839, 852 [speculation on how jury arrived at verdict does not establish good cause for release of juror identifying information]; *People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322 [same].)

Appellant claims that he has a due process right to access confidential juror identifying information. Absent a prima facie showing or jury misconduct, a defendant has no fundamental right to access confidential juror identifying information after trial. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1092; *People v. Jafflo, supra,* 63 Cal.App.4th at p. 1323.)

*CALCRIM 625 - Voluntary Intoxication*

Appellant contends that the trial court erred in not giving a CALCRIM 625 instruction that voluntary intoxication negates malice.[6] The argument fails because the instruction should only be given when the defendant is charged with premeditated murder or harbored express malice. (§ 29.4, subd. (b); *People v. Martin* (2000) 78 Cal.App.4th 1107, 1114-1115; *People v. Timms* (2007) 151 Cal.App.4th 1292, 1296-1297, fn. 4; see Judicial Council of California, Criminal Jury Instructions (Fall 2014 ed.) CALCRIM 625, p. 451.) Voluntary intoxication does not negate implied malice. (*People v. Lam* (2010) 184 Cal.App.4th 580, 585; *People v. Timms,*

---

[6] CALCRIM 625 reads in pertinent part: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,] [or] the defendant was unconscious when he/she) acted. . . ."

*supra,* 151 Cal.App.4th at pp. 1300-1301 [voluntary intoxication irrelevant to issue of implied malice or conscious disregard].)

*Prosecutorial Misconduct*

Appellant contends that the prosecutor misstated the law when he told the jury that the shooting was not an accident unless it was unpreventable. Appellant forfeited the claim by not objecting or requesting a curative admonition. (*People v. Brown* (2003) 31 Cal.4th 518, 533; *People v. Morales* (2001) 25 Cal.4th 34, 43-44.) On the merits, there is no reasonable likelihood that the jury construed or applied the remark in an objectionable fashion. (*Id.*, at p. 44; *People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203.)

The prosecutor, in reference to CALCRIM 510 (Excusable Homicide; Accident) told the jury: "This is not an accident. This was preventable. Accidents are not preventable. Or what I should say is, you cannot foresee accidents. They occur in situations that are not in which a person is doing an unlawful act. [¶] The [appellant's] behavior in this case was entirely preventable, because he knew what he should have been doing was not pointing that gun at somebody. It was entirely preventable because he knew he never should have taken the gun out of the holster after he had been partying all night."[7]

The prosecutor's remarks must be reviewed in the context of his whole argument and the jury instructions. (*People v. Marshall* (1996) 13 Cal.4th 799, 831.) Here the prosecutor urged the jury to find that it was not an excusable homicide

---

[7] CALCRIM 510 provides: "The defendant is not guilty of murder or involuntary manslaughter if he killed someone as a result of accident or misfortune. Such a killing is excused, and therefore not unlawful, if: [¶] 1. The defendant was doing a lawful act in a lawful way; [¶] 2. The defendant was acting with usual and ordinary caution; [¶] AND [¶] 3. The defendant was acting without any unlawful intent. [¶] A person acts with *usual and ordinary caution* if he or she acts in a way that a reasonably careful person would act in the same or similar situation. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was not excused. If the People have not this burden, you must find the defendant not guilty or murder or involuntary manslaughter."

14

because appellant brandished the pistol and pointed it at Bent.  Viewed in this context and the instructions given, there is no reasonable likelihood that the jury construed or applied the complained of remark in an objectionable fashion.  (*People v. Morales* (2001) 25 Cal.4th 34, 44.)  The trial court instructed that "[n]othing that the attorneys say is evidence" (CALCRIM 222)  and"[i]f you believe that the attorney's comments on the law conflict with my instructions, you must follow my instructions.  [¶]  Pay careful attention to all of these instructions and consider them together." (CALCRIM 200)  It is presumed that the jury followed the instructions, not the arguments of counsel, in convicting appellant. (*People v. Morales, supra,* 25 Cal.4th at p. 47.)

We reject the argument that the prosecutor's comment, "accidents are not preventable"  was prejudicial or rendered the trial fundamentally unfair.  (*People v. Bordelon, supra,* 162 Cal.App.4th at p. 1324.)  Prosecutorial misconduct requires reversal when it "infects the trial with such unfairness as to make the conviction a denial of due process. " (*People v. Morales, supra,* 25 Cal.4th at p. 44.)  There was no unfairness here.  "We likewise reject defendant's assertion that counsel's failure to object may have reflected his incompetence. . . . [T]o obtain relief on incompetent counsel grounds, defendant must show a reasonable probability that his counsel's omission affected the verdict.  [Citation.]  We have no sound basis for reaching such a conclusion here."  (*People v. Medina*  (1990) 51 Cal.3d 870, 895; see also *People v. Sheldon* (1989) 48 Cal.3d 935, 951 ["failure" to object to argument or evidence seldom establishes counsel's incompetence].)

*Conclusion*

Appellant argues that the cumulative effect of the alleged judicial errors, prosecutorial misconduct, and ineffective assistance of counsel requires a reversal. We have considered each claim and conclude that none of the alleged errors, either singularly or cumulatively, prejudiced appellant. (*People v. Jenkins*  (2000) 22 Cal.4th 900, 1056.)  Appellant was entitled to a fair trial not a perfect one.  (*People v. Cunningham*  (2001) 25 Cal.4th 926, 1009.)  "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the

15

participants, there can be no such thing as an error free, perfect trial, and . . . the Constitution does not guarantee such a trial. [Citations.]"  (*United States v. Hasting* (1983) 461 U.S. 499, 508-509 [76 L.Ed.2d 96, 108].)

Appellant had a fair trial.  The jury found that he acted with implied malice and simply did not credit the accident defense.  "The mere fact that defendant's testimony was not improbable and was uncontradicted by direct testimony, did not compel the jury to believe it, where the circumstances were such as to reasonably justify an inference of guilt.  (*People v. Neary,* 104 Cal. 373 [. . .].  As was said in *People v. Hall,* 87 Cal. App. 634 [. . .], few criminals would ever be convicted if their explanations were always accepted as gospel truth."  (*People v. Sotelo* (1929) 102 Cal.App. 688, 690; see also *People v. Farris* (1977) 66 Cal.App.3d 376, 383.)

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.


YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

16

Patricia Kelly, Judge

Superior Court County of Santa Barbara

_____

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jason Tran, Supervising Deputy Attorney General, Jonathan M. Krauss, Deputy Attorney General, for Plaintiff and Respondent.