Filed 5/6/21

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

<table>
<tr><td>

THE PEOPLE,

     Plaintiff and Respondent,

v.

JAMES WALKER,

     Defendant and Appellant.

</td><td>

A158423

(Del Norte County
Super. Ct. No. CRF19-9255)

</td></tr>
</table>

James Walker (appellant) appeals following his convictions for felony evasion of a peace officer (Veh. Code, § 2800.2)[1] and other crimes. In the published portion of the opinion, we reject appellant's contention that reckless driving (§ 23103) is a lesser included offense of felony evasion. We reject appellant's remaining arguments in the unpublished portion of the opinion and affirm the judgment.

BACKGROUND

In June 2019, appellant was charged with felony evasion of a peace officer (§ 2800.2); misdemeanor driving under the influence (§ 23152, subd.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.

[1] All undesignated section references are to the Vehicle Code.

1

(f)); and misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)).  The evidence at trial was as follows.

On the morning of May 24, 2019, California Highway Patrol (CHP) officer Larry DePee was in an unmarked vehicle when he received a call about a reckless driver.  DePee saw a vehicle matching the description weaving onto the shoulder and over the double yellow lines into the opposing lane of traffic. He drew up behind the vehicle, and activated his lights and siren.  The driver of the vehicle—later identified as appellant—stuck his hand out of the window, which DePee understood to be an acknowledgement that appellant saw him.

Another CHP officer, Bryan Cooke, soon joined the pursuit.  Cooke was in a marked black and white CHP patrol car with overhead emergency lights.  Cooke took DePee's place immediately behind the vehicle and observed it driving outside its lane on the shoulder.  Cooke turned on his lights and, when the vehicle did not respond, his siren.  At that point the vehicle accelerated and "began to speed away."

The officers followed the vehicle for 24 minutes, driving more than 18 miles.[2]  During the pursuit, appellant reached speeds of 85 miles per hour in a 55 mile per hour zone; crossed into oncoming lanes of traffic, including through blind curves bordered by concrete barriers; drove in the wrong direction on the highway; and narrowly missed oncoming vehicles.

CHP placed a spike strip which appellant drove over after slowing noticeably.  Although all four of his tires began deflating, appellant continued to drive more than three miles before stopping.  After appellant finally pulled over, he complied with some of Cooke's commands but appeared confused

---

[2] A video from Cooke's dashboard camera documenting the chase was played for the jury.

about or unable to respond to others.  He eventually stumbled out of the vehicle, lay on the ground face-down, and was handcuffed.[3]  A bag containing more than 11 grams of methamphetamine was found next to the driver's seat.

Cooke interviewed appellant at the jail.  A video of the interview captured by Cooke's body camera was played for the jury, and a transcript was provided.[4]  Appellant told Cooke someone gave him mushrooms, which he had taken about four hours earlier.  The mushrooms were "supposed to be the ones that get you high" but appellant now thought they were poisonous and he was dying.  After taking the mushrooms appellant ingested "a lot" of methamphetamine in the car: an amount that would get others "high for the night and the next day" but was "enough . . . to keep me awake, alive."  Appellant had difficulty following Cooke's instructions for field sobriety tests; for example, shortly after being asked to estimate when 30 seconds had passed, appellant appeared to have forgotten what he was doing.  Cooke testified that appellant was "extremely impaired" and Cooke had never seen anyone so high on methamphetamine.

Criminalist Kathralynn Cook analyzed a sample of appellant's blood taken at the jail and found it contained more than 1,000 nanograms of methamphetamine per milliliter.  This was the highest level that could be

---

[3] A video from Cooke's body camera of appellant's exit from his vehicle and subsequent arrest was played for the jury.

[4] There are three separate video clips of appellant at the jail, apparently because Cooke turned his body camera off and on.  The first clip was 20 minutes long, the second was two and a half minutes, and the third was four minutes.  Although the record is not entirely clear, it appears the first and second clips were played for the jury in their entirety but the third was not; however, all three clips were transcribed on the transcript provided to the jury.  The portions of the jail interview at issue in this appeal (see part II, *post*) appear in the first clip and it is undisputed they were played for the jury.

3

accurately reported but, based on her testing of diluted samples, Cook "guesstimate[d]" the actual concentration was around 3,000 nanograms per milliliter, one of the highest concentrations she had seen in a living person. Methamphetamine can cause poor judgment and risky behavior, and makes it difficult for a person to perform divided-attention tasks like driving. Cook testified that, in certain circumstances, it was possible for someone who was highly impaired on methamphetamine to be unaware of police following them. She also testified high doses of methamphetamine can cause "meth psychosis," a condition similar to schizophrenia.

The jury found appellant guilty of all three counts. In a bifurcated proceeding, appellant admitted a prior serious felony conviction. The trial court sentenced appellant to prison for an aggregate term of six years.

## DISCUSSION

### I. *Lesser Included Offense*

Appellant argues the trial court erred in failing to sua sponte instruct the jury on reckless driving (§ 23103) as a lesser included offense of felony evasion of a peace officer (§ 2800.2). We disagree.

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] . . . [¶] To determine if an offense is lesser and necessarily included in another offense for this purpose, we apply either the elements test or the accusatory pleading test. 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is

4

necessarily included in the former.'" (*People v. Shockley* (2013) 58 Cal.4th 400, 403–404 (*Shockley*).)[5]

Felony evasion of a peace officer is committed when "a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1[6] and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property . . . ." (§ 2800.2, subd. (a).) Reckless driving is committed when "[a] person . . . drives a vehicle upon a highway in willful or wanton disregard for the safety of persons or property . . . ." (§ 23103.) At first glance, appellant's argument that reckless driving is a lesser included offense of felony evasion appears sound. However, the meaning of the phrase "willful or wanton disregard for the safety of persons or property" is materially different for the two statutes. (See *People v. Taylor* (2018) 19 Cal.App.5th 1195, 1202 (*Taylor*) ["the same phrase may appear in two statutes establishing offenses, yet convey different meanings"].)

"As the reckless driving statute has never defined driving with 'willful or wanton disregard for the safety of persons or property,' courts have determined that it targets driving manifesting a particular state of mind [citation], namely, 'consciousness of the results with intent to omit or do an act, realizing the probable injury to another; or acting in reckless disregard of the consequences; or conduct exhibiting reckless indifference as to the probable consequences with knowledge of likely resulting injury' [citation]." (*Taylor, supra,* 19 Cal.App.5th at p. 1202; see also *People v. Barber* (2020) 55 Cal.App.5th 787, 802, 808 [approving CALCRIM No. 2200 reckless driving

---

[5] Where, as here, "the information charging [appellant] . . . simply tracked [the statute's] language without providing additional factual allegations, we focus on the elements test." (*Shockley, supra,* 58 Cal.4th at p. 404.)

[6] Section 2800.1 provides that a motorist fleeing a pursuing peace officer under certain conditions is guilty of a misdemeanor.

instruction providing, " 'A person acts with *wanton disregard for safety* when (1) he or she is aware that his or her actions present a substantial and unjustifiable risk of harm, and (2) he or she intentionally ignores that risk.' "].)

The felony evasion statute, in contrast, sets forth a specific definition of the term: "For purposes of this section, a willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs." (§ 2800.2, subd. (b).) "Violations that are assigned points under section 12810 . . . include driving an unregistered vehicle owned by the driver (§§ 40001, 12810, subds. (e), (g)(1)), driving with a suspended license (§§ 14601, 12810, subd. (i)), driving on a highway at slightly more than 55 miles per hour when a higher speed limit has not been posted (§§ 22349, subd. (a), 12810, subd. (e)), failing to come to a complete stop at a stop sign (§§ 22450, 12810, subd. (e)), and making a right turn without signaling for 100 feet before turning (§§ 22108, 12810, subd. (e))." (*People v. Howard* (2005) 34 Cal.4th 1129, 1137–1138 (*Howard*).)

As demonstrated by the above list of violations, this definition, which was added to section 2800.2 in 1996, "greatly expanded the meaning of the quoted statutory phrase to include conduct that ordinarily would not be considered particularly dangerous." (*Howard, supra,* 34 Cal.4th at p. 1138 [holding felony evasion is not an inherently dangerous felony for purposes of the second-degree felony-murder rule].) Indeed, it encompasses conduct unrelated to safety, for example, driving an unregistered vehicle owned by the driver: "There is no reason why an unregistered car cannot be driven

6

safely. [Section 12810] thus contemplates that traffic violations involving the operation of a motor vehicle, *including those not related to safety*, are worth a point unless otherwise stated." (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 643, italics added; see also *People v. Pinkston* (2003) 112 Cal.App.4th 387, 396 (dis. opn. of Klein, J.) ["Obviously, a defendant may commit three Vehicle Code violations or cause property damage during a pursuit while exercising extreme vigilance for the safety of persons or property."].)[7]

Unsurprisingly, then, courts have concluded (albeit in a different context than the one presented here) that the definition of "willful or wanton disregard" in section 2800.2 is significantly broader than the traditional definition of the phrase as used in the reckless driving statute. *Taylor, supra,* 19 Cal.App.5th 1195, considered an argument that the definition in section 2800.2, subdivision (b), creates an unconstitutional mandatory presumption reducing the prosecution's burden of proving the "willful or wanton disregard" element of felony evasion.[8] The court noted that, "[a]s originally enacted in 1988, section 2800.2 contained only the provision now found in subdivision (a), which states that the offense is committed when a person violates section 2800.1 while driving in 'a willful or wanton disregard for the safety of persons or property . . . .' (Stats. 1988, ch. 504, § 3, p. 1919.)

---

[7] For this reason, we reject appellant's suggestion that fleeing from police while committing three point violations necessarily constitutes "willful or wanton disregard" under the traditional definition of the term.

[8] "[A] mandatory presumption ' "tell[ing] the trier of fact that he or they *must* find the elemental fact upon proof of the basic fact, at least until the defendant has come forward with some evidence to rebut the presumed connection between the two facts . . . ." ' . . . contravenes due process—and thus is improper—when it relieves the prosecution of its burden of proving the elements of a crime beyond a reasonable doubt." (*Taylor, supra,* 19 Cal.App.5th at p. 1200, fn. omitted.)

Because the statute then lacked any provision defining the requisite driving with 'willful or wanton disregard,' courts construed the offense to involve or require two distinct mental states, namely, (1) the ' "intent to evade" ' required for the section 2800.1 offense [citation], and (2) the mental state required for the reckless driving offense specified in section 23103." (*Taylor,* at p. 1203.) The addition of section 2800.2, subdivision (b), "expanded the types of driving proscribed under the statute . . . . [S]ubdivision (b) of section 2800.2 permits the prosecution to show the requisite driving with 'willful or wanton disregard' by establishing three or more traffic violations, as an alternative to showing that the defendant drove in a manner manifesting the mental state required for the reckless driving offense. For that reason, the mental state relating to the reckless driving offense is no longer an essential element or component of the section 2800.2 offense."[9] (*Taylor,* at p. 1203; see also *People v. Laughlin* (2006) 137 Cal.App.4th 1020, 1025 ["three or more violations that are assigned a traffic point count may not necessarily compel the conclusion that the defendant acted with a willful or wanton disregard for the safety of persons or property, as that term has traditionally been defined"].)

We agree with the above cases that "willful or wanton disregard" as defined in section 2800.2, subdivision(b), is significantly broader than the traditional definition of the phrase used in the reckless driving statute. Because the statutory elements of section 2800.2 thus do *not* include all of the statutory elements of reckless driving, reckless driving is not a lesser included offense.

---

[9] Appellant argues this portion of *Taylor's* analysis was dicta. Even so assuming, we find it persuasive.

8

II.     *Jail Interview*

In the video of appellant's jail interview that was played for the jury without objection, appellant made statements about prior convictions and prison terms.  Appellant raises two related arguments with respect to these statements: first, the trial court erred in denying his subsequent mistrial motion; and second, he received ineffective assistance of counsel.

A.     *Additional Background*

Approximately 15 minutes into the video of Officer Cooke's jail interview with appellant recorded on Cooke's body camera, Cooke leaves the jail to retrieve something from his car.  As he returns, the video captures another officer asking appellant, "So you got manslaughter instead of murder?"  Appellant responds, "Yeah."  The officer asks, "How long ago was that?" and appellant says it happened in 2003.  This exchange is difficult to hear and was not included in the transcript provided to the jury, but the parties agree the exchange is audible if the video is played at high volume.

The next exchange between appellant and the officer can be heard more clearly and was included on the transcript provided to the jury, as follows:

"UNIDENTIFIED OFFICER *(Female)*:  What prison did you go to?

"JAMES WALKER:  Which one?

"UNIDENTIFIED OFFICER *(Female)*:  Yeah.

"JAMES WALKER:  I've been to a lot of them.

"UNIDENTIFIED OFFICER *(Female)*:  A lot of them?

"JAMES WALKER:  Yeah.

"UNIDENTIFIED OFFICER *(Female)*:  All right.

"JAMES WALKER:  *(inaudible)*, uh, San Quinton [sic], some others. *(inaudible)* the one up here."

9

Defense counsel did not object when the video was played for the jury or the transcript was provided.

One week later, defense counsel moved for a mistrial based on appellant's statements about prior prison terms in the video and transcript. Counsel explained her failure to object: "At the time that this video was played -- and I do not know if the Court is aware of it -- but my client was having some issues maintaining his emotions and comments. So at the time that the video was played, he was talking in my ear. And I did not hear that part of the video being played. Afterwards my client was complaining about it. And when you looked through my copy of transcripts, two pages were missing which also included the page where it says that he made a statement about San Quentin and implied Pelican Bay State Prison. [¶] So as I was looking through the transcripts, I didn't see it. So I didn't make the objection at the time because I didn't hear it, I didn't see it in the transcripts. And I wasn't sure what my client was talking about." Counsel conceded she received the video more than three weeks before trial and the transcript four days before trial. Counsel argued an admonition could not cure the prejudice to appellant.

The prosecutor argued the statements were admissible to contradict a statement appellant made earlier in the video that he had never had a ticket. Appellant's statement was, "I've got a good -- you know what, all my life I've never even had a -- had one ticket." The prosecutor also argued the prior prison term statements were brief and made in the middle of an approximately 25-minute video, the evidence of appellant's guilt was overwhelming, and any concerns could be addressed with a limiting instruction.

The trial court denied the motion, stating the video was disclosed well before trial, the video and transcript were admitted without objection, and the statements were "innocuous" because the jury "heard nothing about priors, nothing if they are even related to this kind of issue or not."

Appellant subsequently requested the following jury instruction: "you may or may not [have] heard of defendant's prior prison history, including jail time served. Any statements are not to be considered and are not to be considered by you as to defendant's guilt as to the crimes charged." The prosecutor argued again that the statements could be considered for the limited purpose of contradicting appellant's prior statement about never receiving a ticket, showing the prior statement was falsely made "to try to minimize his actions or to try to get a break." The prosecutor also represented that he would not be commenting on appellant's prison term statements during closing arguments. The court provided the following instruction to the jury: "You may or may not have heard evidence of Defendant's prior criminal history, including any jail or prison time served. Any statement(s) evidencing such are not to be considered by you for purposes of deciding Defendant's propensity to commit the crimes he is charged with." Appellant does not argue on appeal that the trial court erred in providing the narrower admonition.

B.    *Mistrial*

" ' " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions . . . .' [Citation.] A motion for a mistrial should be granted

11

when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " ' " (*People v. Harris* (2013) 57 Cal.4th 804, 848 (*Harris*).)

As an initial matter, appellant forfeited any reliance on the untranscribed manslaughter statement captured in the video as a basis for the mistrial motion by failing to rely on it in the trial court. (*Harris, supra,* 57 Cal.4th at p. 849 ["Because defendant did not raise this basis for his [mistrial] motion at trial, he has forfeited the claim on appeal."].) In addition, although appellant argues both the prior prison term and manslaughter statements were inadmissible, he forfeited any such claim by failing to timely object to their admission. (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1021 ["Rather than pose contemporaneous objections, TCC waited and brought a motion for a mistrial; however, by that time, any error had been forfeited."]; *Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 865 [hearsay objection untimely where made as motion for mistrial after the witness finished testifying], disapproved on other grounds in *People v. Ault* (2004) 33 Cal.4th 1250, 1272, fn. 15.)

We thus consider whether the trial court abused its discretion in finding any prejudice from appellant's statements about his prior prison terms could be cured by an admonition. We acknowledge the potential prejudice of evidence that a defendant was previously imprisoned.[10] Nonetheless, the statements were brief and buried in the middle of a more than 20-minute video and a 26-page transcript. (See *People v. McNally* (2015) 236 Cal.App.4th 1419, 1428 ["Based on the length of the video (40

_____

[10] Appellant also points to a facial expression made by the female officer at the time of appellant's statement, arguing it expresses "disapproval and prejudgment." We find the facial expression ambiguous; in any event, trial counsel referred to it only as "odd" and therefore any reliance on it as prejudicial is forfeited. (*Harris, supra,* 57 Cal.4th at p. 849.)

12

minutes), the trial court reasonably concluded that the fleeting reference to PTSD did not irreparably damage appellant's chances to receive a fair trial."].) The statements did not reveal to the jury the nature of appellant's crimes.[11] The court subsequently admonished the jury not to consider the statements as propensity evidence. " 'Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured.' " (*McNally,* at pp. 1428–1429.) We conclude the trial court did not abuse its discretion in concluding that any prejudice could be cured by admonishment.

C. *Ineffective Assistance of Counsel*

" ' "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] . . . Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel." ' " (*People v. Brown* (2014) 59 Cal.4th 86, 109.)

Defense counsel's representation was deficient. As she explained below, counsel had no tactical reason to fail to object to or file an in limine motion to exclude the video and transcribed statements about appellant's prior prison terms. Given her subsequent mistrial motion based on these statements, we fail to conceive of any tactical reason for failing to also raise

---

[11] Although appellant asserts the jurors "would no doubt be familiar with" the reputations of San Quentin and Pelican Bay prisons (and would understand appellant's reference to "the [prison] up here" as Pelican Bay), we decline to so presume.

the untranscribed manslaughter statement below, either by objecting to it or by including it as a basis for her mistrial motion.

However, appellant fails to establish prejudice. As an initial matter, with respect to the manslaughter statement, appellant concedes it is difficult to hear the exchange on the video but argues "[t]he record does not reflect the volume the interview was played or the extent to which at least one of the jurors may have heard it and relayed such information to the other jurors during deliberation." The statement did not appear in the transcript, defense counsel did not raise it as a basis for the mistrial motion, and the court did not appear to have heard it (stating the jury "heard nothing about priors"). This all strongly suggests that the statement was not audible to the jury. Absent any indication that the jury could have heard the comment, appellant has not met his burden to demonstrate prejudice with respect to the manslaughter statement.

In addition, with respect to all of the challenged statements—assuming (without deciding) the trial court would have excluded the evidence had a timely motion or objection been made—in light of the extremely strong evidence against appellant, it is not reasonably probable the verdict would have been more favorable. During closing arguments, defense counsel conceded appellant's guilt as to the driving under the influence and methamphetamine possession counts. As for the felony evasion count, appellant does not dispute that he drove with willful or wanton disregard but argues (as he did below) he was so impaired by methamphetamine that he was unaware that the police were behind him and therefore lacked the intent to evade the police. Although there is some evidence supporting appellant's contention, this evidence is weak and the contrary evidence is significant.

14

On cross-examination, defense counsel asked Cook, the prosecution's criminalist (not to be confused with Officer Cooke, the arresting officer), whether it would be possible for a person who was highly impaired on methamphetamine to be so focused on driving that they do "not realize that an officer is trying to pull them over?" Cook answered: "I would think it could be possible. I have seen cases where individuals do not react to just the lights of an officer, they need the sound. Or it may take repeated attempts, in the instances that I'm familiar with in this, they were like asleep-type cases. Depressant-type cases or opiate-type cases where they're not actually driving, they are sleep coasting and then they have to come out of that reaction." She later added, "In the cases that I experienced, as in reviewing police reports, these individuals eventually do pull over and it may take two or three times of making the siren, the noise, to make them react. . . . [I]n my experience I haven't been aware of somebody completely ignoring an officer entirely, so I don't know if I could speak on that." Cook also testified, in response to defense counsel's questions, "Very high doses of methamphetamine can cause paranoia and what they call meth psychosis which mimics schizophrenia."

Cook's testimony that methamphetamine could impair an individual to the point where they were unaware of police following them was not strong evidence that explained appellant's failure to pull over. First, Cook indicated such an impairment might occur when a person was "sleep coasting." This was plainly not the case for appellant, who drove for more than 20 minutes and 18 miles. Second, Cook's testimony that an individual might be so focused on driving that they were unaware of police following them indicated this lack of awareness would be fairly brief: the person might not be aware of flashing lights but would become aware when sirens started, or they might

15

not be aware the first few times the sirens were activated but would become aware after that. Officer Cooke followed appellant in a marked patrol vehicle with lights flashing and sirens activated *for more than 20 minutes.* Criminalist Cook's testimony gave no indication that methamphetamine could preclude a person's awareness of a pursuing officer for such a long period of time. Finally, any theory that appellant was in a methamphetamine-induced psychosis was strongly undermined by his conduct at the time of his arrest and during the jail interview: although he appeared intoxicated and disoriented, there was no indication that he was in a psychotic state.

In contrast, there was significant evidence that appellant was aware of his surroundings. When Officer DePee first activated his lights and siren, appellant put his hand out his window in what appeared to be a wave or other acknowledgement of the officer behind him. When Officer Cooke first turned his siren on behind appellant, appellant accelerated and sped away. Appellant slowed down noticeably before driving over the spike strip and, after he finally pulled over, responded to Cooke's instructions, if with some confusion and difficulty.

In addition to the weight of the evidence, the challenged statements were brief and buried in the middle of a 20-minute video, as noted above; the prosecutor did not refer to the statements during his closing arguments; and the court issued a limiting instruction admonishing the jury not to use the statements as propensity evidence. Appellant has failed to demonstrate he was prejudiced by his counsel's deficient performance.

16

III.    *Sentencing*

Appellant challenges certain factors relied upon by the trial court in imposing the aggravated term for felony evasion and seeks a remand for resentencing.  We affirm.

"A trial court's sentencing decision is subject to review for abuse of discretion.  [Citation.]  '[A] trial court will abuse its discretion . . . if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision." (*People v. Hicks* (2017) 17 Cal.App.5th 496, 512.)

At sentencing, the trial court found the following aggravating factors applied: the crime involved a threat of great bodily harm and a high degree of callousness (Cal. Rules of Court, rule 4.421(a)(1));[12] the defendant engaged in violent conduct (rule 4.421(b)(1)); the defendant's prior convictions are numerous or of increasing seriousness (rule 4.421(b)(2)); the defendant served a prior prison term (rule 4.421(b)(3)); and the defendant's prior performance on probation or parole was unsatisfactory (rule 4.421(b)(5)).  The trial court found no circumstances in mitigation.  The court imposed the aggravated term for the felony evasion count.

Appellant does not dispute the trial court's reliance on his prior convictions, prison terms, and unsatisfactory performance on probation or parole.  He argues the court's reliance on the threat of great bodily harm was impermissible in light of the willful or wanton disregard element of felony evasion.  (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1292 ["a court may not 'use a fact constituting an element of the offense either to aggravate or to enhance a sentence' "].)  For the reasons explained in part I, the "willful or wanton disregard" element of felony evasion can be satisfied by conduct

---

[12] All undesignated rule references are to the California Rules of Court.

that does not threaten great bodily injury. Accordingly, reliance on this factor was not impermissible.

Appellant also argues the court's reliance on the crime's callousness and appellant's violence was improper, the court improperly ignored the mitigating factors that appellant's conduct was due in part to substance abuse and mental illness, and the court also ignored the mitigating factor that appellant purportedly successfully completed his most recent term of probation. Even assuming these errors, we affirm.

"A single factor in aggravation will support imposition of an upper term. [Citation.] 'When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper.' " (*People v. Cruz* (1995) 38 Cal.App.4th 427, 433–434.) Three of the aggravating factors relied on by the court are not challenged by appellant and we have rejected appellant's challenge to a fourth factor. Moreover, the trial court's comments at the sentencing hearing indicate the court was greatly troubled by the serious danger posed by appellant's crime: "[I]t is probably one of the most egregious, if not the most egregious 2800.2 I have seen, driving head-on into oncoming traffic, not once, but twice, it is a mere definition of deadly danger and violence. Had he hit someone, especially on the blind corner concrete barriers, it would have been instantaneous death for an individual coming around the blind corner." The court also found "the aggravated term far outweighs the mitigated term." It is clear that selection of the aggravated term was not a close call for the trial court, and it is not reasonably probable that any assumed errors would have resulted in a different sentence.

18

## DISPOSITION

The judgment is affirmed.

_____

SIMONS, Acting P.J.

We concur.


_____

NEEDHAM, J.


_____

RODRIGUEZ, J.*


(A158423)

_____

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


20

Superior Court of Del Norte County, No. CRF19-9255, Hon. Darren McElfresh, Judge.

Jonathan D. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Eric D. Share and John H. Deist, Deputy Attorneys General, for Plaintiff and Respondent.