Filed 9/26/16  P. v. Acosta CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C074628 |
| Plaintiff and Respondent, | (Super. Ct. No. SF118511A) |
| v. | |
| ANTHONY PAUL ACOSTA, | |
| Defendant and Appellant. | |

Defendant Anthony Paul Acosta shot David Slape once in the head and killed him for Slape's gold chain.  Convicted of murder and robbery and sentenced to life without possibility of parole, defendant appeals.  He contends:  (1) the trial court erred by admitting YouTube videos showing defendant holding what may have been the murder weapon, (2) the court erred by not giving the jury an instruction limiting its consideration of the YouTube videos, (3) the court erred by instructing the jury that a witness's custodial status does not, by itself, make the witness more or less believable, (4) the court

1

erred by denying defendant's petition for disclosure of juror identification information, and (5) the minutes and abstract of judgment must be corrected to show that no parole revocation fine was imposed. We conclude that only the last contention has merit. Therefore, we affirm the judgment and remand for the trial court to correct the minutes and abstract of judgment.

## FACTS AND PROCEDURE

During the evening of September 10, 2010, defendant and his friends Jimmie Turner and Sean Olivas drove around together in Turner's two-door Buick Regal. Defendant had a gun in his lap. The gun looked like the gun Turner saw defendant holding when he made a YouTube video at Turner's house. Olivas drove, with Turner in the front passenger seat and defendant in the backseat behind Olivas. Eventually, they picked up Slape and Sylvia Broderick, who both rode in the backseat with defendant. Slape was wearing a heavy gold chain.

Defendant wore a long-sleeve, red shirt, along with dark colored pants. He did not wear a hat. Turner wore a short-sleeve, black shirt, with dark pants and a hat. And Olivas wore a black and white sweater.

Olivas lost his phone, and he repeatedly asked Slape about it.

The group arrived at an apartment complex, where everyone except Turner and Olivas got out of the car. As Slape was going into an apartment, Olivas asked again about the phone. Slape went to the driver's side of the car and bent down to speak to Olivas. Defendant, who was about three feet behind Slape, shot Slape in the head. He stood over Slape, who had fallen to the ground, and took the gold chain from Slape's neck.

Defendant got into the car through the driver's side door and Olivas drove away. He also said, "I just smacked him," and, "I have two chains now." Olivas saw the gun in defendant's possession right after the shooting, and Turner saw the gun on defendant's lap.

2

Mario Arreaga was at the apartment complex and heard a gunshot. When he looked outside, he saw a short and skinny, light-complexioned, male Mexican, about 18 years old, with dark pants, no hat, and a short-sleeve, red shirt standing over Slape. (Defendant's was the only red shirt in the group, but it was long-sleeved. Other than the length of the sleeves of defendant's shirt, Arreaga's description was consistent with defendant's appearance.)

The next day, defendant gave a heavy gold chain to Eliza Longoria and had her pawn it for him. She received $2,880 for the chain and gave the money to defendant.

An investigation of the murder scene revealed no casing from a bullet, which is consistent with use of a revolver because the casing stays in the gun. The bullet recovered from Slape's head was a .38-caliber bullet, most likely fired from a .357 magnum or .38 special, which are revolver calibers.

Talking to his stepfather's best friend (the victim's uncle) later, defendant denied being at the location where Slape was shot. He also lied to a detective, saying he was not at the murder scene. Defendant told Longoria that, if she told anyone that he had her sell the chain, she "had something coming." While in custody, defendant saw Longoria and made a motion simulating a zipper across his lips. He also threatened her and told her not to talk.

At trial, defendant admitted he was at the murder scene but claimed Turner got out of the car, came around to the driver's side, shot Slape in the head, and got back in the car.

A jury convicted defendant of (1) first degree murder (count 1; Pen. Code, § 187),[1] with a true finding that defendant discharged a firearm causing death (§ 12022.53, subd. (d)) and with a special circumstance that the murder was committed

---

[1]    Hereafter, unspecified code citations are to the Penal Code.

3

during the commission of robbery; and (2) robbery (count 2; § 211), with a true finding that defendant discharged a firearm causing death (§ 12022.53, subd. (d)).

The trial court sentenced defendant to life without possibility of parole for the special circumstance murder, plus 25 years to life for the discharge enhancement. The court also sentenced defendant to the upper term of five years for the robbery conviction, plus 25 years to life for the discharge enhancement, but the court stayed the sentence on the robbery count under section 654.

Additional facts and procedure are recounted as they become relevant to the discussion of defendant's contentions on appeal.

DISCUSSION

I

*Admission of YouTube Videos*

The trial court, over the defense's Evidence Code section 352 objection, admitted two YouTube videos showing defendant in possession of a revolver. The videos laid the groundwork for a prosecution expert to testify that the revolver that defendant possessed in the videos could have been the gun used to kill Slape. On appeal, defendant contends that the trial court abused its discretion in admitting the YouTube video evidence. However, the contention is without merit. The trial court did not abuse its discretion in determining that any prejudicial effect of the YouTube video evidence did not substantially outweigh the probative value of the evidence.

A.     *Background*

The first YouTube video was filmed at night, perhaps just a couple of weeks before the murder. Defendant and another man are in the same car defendant was in on the night of the murder, with defendant in the driver's seat and the other man in the front passenger seat. Rap music is playing in the stationary car. The other man raps along with the music to some extent, and defendant does so to a lesser extent. Many of the rap lyrics are incomprehensible; however, obscenities are used prominently, along with other

4

references to sexual activities. There are also references to gangs in the lyrics: "Don't fuck with the bloods. Don't fuck with no crips."

The relevance of the first clip, as well as the second clip, lies in the fact that defendant is seen with a revolver in his lap. During the first clip, defendant is twice shown, in a matter of a few seconds, pointing the revolver at the camera. Before that, he points to the revolver.

Defendant claims that the lyrics of the rap music, repeated by the other man with defendant in the car, include the phrase "we deep in the gang." To the contrary, the phrase sounds more like "we deep in the game." The lyrics also include the repeated words, "I need to know what part of the game is that." So there are additional references to a "game" in the lyrics. Defendant's claim that the phrase "we deep in the gang" is uttered in the videos is made for the first time on appeal, and it appears to have no foundation in the video, which has been forwarded to this court as an exhibit.

In the second YouTube video, defendant and the other man are in the same car during the day. The video shows them driving up to the camera, with defendant in the front passenger seat. When the camera approaches the open passenger window of the car, the two men unleash a string of obscenities, and defendant waves the same revolver at the camera.

During the hearing on whether to admit the YouTube video evidence, the prosecution read a statement from the Department of Justice, as follows: "Based on observations made from the videos, the firearm [defendant] is brandishing appears to be a blue, five-shot double action revolver of unknown manufacture and caliber with a three or four-inch barrel and fixed sites. Because both Security Industries and Rossi produced revolvers with characteristics similar to the revolver in the video recordings, this revolver cannot be ruled out as a possible source of the bullet." The reference to "the bullet," was to the bullet that killed Slape.

5

The prosecution also stated that, when Broderick saw the YouTube video, she told police that the gun in the video looked like the gun she saw in defendant's possession on the night of the murder. However, she was drunk and was not sure.

Defendant's Evidence Code section 352 objection focused on the revolver in the videos. He argued that "the only possible reason for offering such evidence is to suggest to the jury that because the defendant owned/possessed a gun, he must have had a weapon on the night of the homicide." He also argued it could be used as propensity evidence.

The trial court ruled on the admissibility of the YouTube video evidence, as follows:

"Now, the prosecution would argue that this is very probative because it shows the defendant with a gun two weeks before the incident. In other words, he has access to a firearm. Maybe DOJ can't say exactly what caliber it is, although there is a witness who is going to testify that it looked like the gun, not with great certainty, but that's what she's going to say. The – so there is relevance.

"The question is: Does the prejudicial effect outweigh the probative value? And there is strong probative value because he's charged with being in this vehicle and having a gun and shooting someone with a firearm, a handgun. Well, two weeks before, there he is, same vehicle, with a firearm. The only difference is there is a question as to whether or not that was the firearm.

"Now, is it prejudicial? There is a certain amount of prejudice because he's with a firearm. And if it's a different firearm, then the jury might say, well, he's guilty of this offense even though he didn't have the firearm that is involved in this offense in that You Tube video. However, I think that the probative value outweighs the prejudicial effect because I think a jury can make a decision as to whether or not this – there is evidence showing this really was the firearm in the You Tube video. They will be able to determine the credibility of this witness as to whether or not it was the same firearm.

6

"And I think they'd be able to determine whether this was not the firearm and whether this is something to be disregarded. But I think it's very strong evidence that the defendant had and did, in fact, have the firearm two weeks before this incident. And he had the opportunity and the means to commit this offense. So I'm going to allow that evidence over objection."

B.    *Analysis*

"Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) The trial court has broad latitude in determining the relevance of evidence. [Citations.] We review such determinations for abuse of discretion. [Citations.] . . . [¶] . . . [¶] A trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. (Evid. Code, § 352; [citation].) . . . [¶] On appeal, we review the trial court's rulings on the admissibility of evidence for abuse of discretion. [Citations.]" (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.)

Defendant contends that the prejudicial effect of the YouTube video evidence substantially outweighed its probative value because (1) the evidence that the revolver in defendant's possession in the videos was also the gun used in the murder was minimal and speculative, (2) there was no evidence that the revolver belonged to defendant or that he had access to it other than when the video was being shot, (3) the videos showed him in possession of a gun, (4) the videos portrayed defendant in an odious light, and (5) the videos improperly introduced gang evidence.

The most fundamental problem with defendant's contention on appeal is that he claims that the other man in the car during the first YouTube video said, "we deep in the gang." We disagree based on our review of the video, and there is, quite simply, no indication on this record that the jury interpreted the statement in the YouTube video as "we deep in the gang." Along with the other references to "the game," it sounds like the

statement was "we deep in the game." Furthermore, no attention was ever drawn to that statement by either party, lending credence to our impression from watching the video that it was not an objectionable reference to any gang membership or activity by defendant or the other man in the car.

While defendant tries to minimize the probative value of the YouTube video evidence, we agree with the trial court that, in the context of this case, it was highly probative. The evidence cited in connection with the Evidence Code section 352 objection sufficiently established that probative value. As little as two weeks before the murder, defendant was filmed in possession of a revolver that looked like revolvers manufactured by either Security Industries or Rossi. Broderick said that the gun in the videos looked like the gun she saw in defendant's possession the night of the murders. And the forensic evidence from the bullet, as well as the absence of a casing at the murder scene, was consistent with use of a revolver like the one shown in the videos. These facts supported the prosecution's theory, and they cast doubt on defendant's claim that someone else shot Slape.

On the other hand, the prejudicial effect of the evidence is not as pronounced as defendant argues.

That the evidence showed that defendant was in possession of a gun that may have been the murder weapon does not rise to the level of prejudice demanding exclusion. To the contrary, the "prejudice" referred to by Evidence Code section 352 does not refer to damage " 'that naturally flows from relevant, highly probative evidence' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958), but instead to "evidence that poses an intolerable risk to the fairness of the proceedings or reliability of the outcome." (*People v. Booker* (2011) 51 Cal.4th 141, 188.) The videos did not simply show defendant possessing a gun; they showed him in possession of a gun that, based on other evidence, the jury could have reasonably inferred was the murder weapon.

8

As for the arguments that the YouTube videos cast defendant in an odious light and that they associated him with gangs, the claim of prejudice simply does not outweigh the probative value. Certainly, the language used in the videos was not socially appealing, and there were comments in the lyrics associated with gangs. (For example, "Don't fuck with the bloods. Don't fuck with no crips.") Nevertheless, these matters did not establish the type of prejudice that requires a trial court to exclude probative evidence.

The trial court did not abuse its discretion under Evidence Code section 352 by admitting the YouTube video evidence.

In addition to defendant's argument that the trial court abused its discretion by admitting the YouTube evidence, defendant contends: (1) counsel for defendant violated his right to counsel by failing to preserve the gang-evidence element of the objection, (2) the trial court erred because it assumed that the jury would disregard the evidence if it determined that the gun in the video was not the same one used in the murder, and (3) admission of the evidence violated his due process rights. None of these contentions has merit.

First, to the extent the content of the YouTube videos contained references to gangs, there was no failure of counsel to preserve an objection to that content. Counsel objected to admission of the YouTube videos under Evidence Code section 352, and the trial court viewed the videos to determine their admissibility. There is no indication in the record that the trial court did not consider the entirety of the videos in making its determination.

Second, defendant claims that the trial court admitted the YouTube video evidence under Evidence Code section 352 based simply on its belief that the jury would disregard the evidence if it concluded that the gun in the videos was not used in the murders. Defendant bases this claim on a statement by the trial court, made during discussions concerning the Evidence Code section 352 hearing, that the jury would "be able to

9

determine whether this was not the firearm and whether this is something to be disregarded." There was no error. The court's statement referred to the argument that the gun was the one used in the murder and whether the jury would credit that argument. It did not mean that the jury would simply disregard the evidence and therefore the evidence was admissible regardless of prejudice. Defendant reads too much into the statement.

Third and finally, defendant's argument that admission of the YouTube video evidence violated his due process rights is premised entirely on the argument that admission of the evidence was an abuse of discretion under Evidence Code section 352 or 1101 (as propensity evidence, which it was not). Therefore, this argument is also without merit.

II

*Limiting Instruction on YouTube Video*

Defendant contends that the trial court erred by not giving the jury an instruction, on its own motion, that the jury must disregard the YouTube video evidence if it concludes that the gun in the videos was not the murder weapon and that the evidence could not be used to show bad character or propensity to commit murder. This contention is based, at least implicitly, on the mistaken impression that the lyrics of the rap music tied defendant and the other man in the car to a gang or gang activity. As we explained, the lyrics did not tie defendant and the other man to a gang or gang activity. While there were references in the lyrics to gangs, those lyrics did not imply that defendant and the other man were gang members. Instead, the lyrics implied that defendant was neither a blood nor a crip, and they made no reference to any other gang.

"Trial courts generally have no duty to instruct on the limited admissibility of evidence in the absence of a request. [Citation.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1020.) Defendant does not assert that he requested a limiting instruction; instead, he claims this is the "occasional extraordinary case in which unprotested evidence of past

10

offenses [or, here, simply gang membership] is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*People v. Collie* (1981) 30 Cal.3d 43, 64 (*Collie*).)

This is not an extraordinary case, as identified by *Collie*, because the references to gangs were minimal and did not imply that defendant was a gang member. Therefore, the trial court had no duty to give a limiting instruction on its own motion.

Defendant also contends that his trial counsel violated his right to effective counsel by not requesting a limiting instruction. This contention is also without merit.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was deficient and fell below an objective standard of reasonableness and (2) it is reasonably probable that a more favorable result would have been reached absent the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694].) A reasonable probability is a "probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.)

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions. [Citation.] Were it otherwise, appellate courts would be required to engage in the ' "perilous process" ' of second-guessing counsel's trial strategy. [Citation.] Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 979-980, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

It is not necessary for the court to examine the performance prong of the test before examining whether the defendant suffered prejudice as a result of counsel's alleged deficiencies. (*Strickland v. Washington, supra,* 466 U.S. at p. 697.) "If it is

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Ibid.*)

Here, it is not reasonably probable that defendant would have obtained a more favorable result absent the allegedly deficient performance. The references to gang activity in the YouTube videos were minimal, and no argument was made in the trial court that defendant or others were gang members. Also, no argument was made that the jury should or could use the YouTube videos as evidence of defendant's character or propensity to commit murder. This is not a case in which evidence of past acts, as shown in the YouTube videos, would lead a jury to improperly convict based on character or propensity or on anything other than relevant and admissible evidence.

## III

### *Instruction on In-custody Witness*

Both Eliza Longoria and Jimmie Turner were in custody when they testified because they had earlier failed to appear when subpoenaed. The trial court instructed the jury concerning their testimony using CALCRIM No. 337, as follows: "When Eliza Longoria and Jimmie Turner testified, they were in custody. The fact that a witness is in custody does not by itself make a witness more or less believable. Evaluate the witness's testimony according to the instructions I have given you."

On appeal, defendant contends the trial court erred and violated his Sixth Amendment rights because the witness's custody status at the time they testified had a bearing on their credibility. We conclude that, even assuming for the purpose of argument that the instruction was erroneous under these circumstances, there was no prejudice.

Defendant argues that, because he alleges a violation of the Sixth Amendment, we must apply the harmless error standard stated in *Chapman v. California* (1967) 386 U.S. 18, at page 24 [17 L.Ed.2d 705, 710-711].) Again, assuming error only for the purpose of

12

argument, we apply that standard and ask whether the error was harmless beyond a reasonable doubt. (*Ibid*.)

The asserted error in instructing the jury here had no effect on the jury's verdict because the jury was allowed to fully evaluate the credibility of the witnesses. While the instruction told the jury not to draw a conclusion concerning the credibility of Longoria or Turner based on their "in custody [status,] by itself," the reason for their custodial status was revealed to the jury – that is, they both had failed to appear when subpoenaed, so they were arrested and held. Nothing in the instructions prevented the jury from considering the custodial status of Longoria or Turner because the reason for their custodial status was given. In other words, the evidence showed more than custodial status, by itself.

While the jury could consider the witness's custodial status in connection with the reason for that status, there was also no limitation on the defense's introduction and the jury's consideration of other evidence potentially bearing on the credibility of Longoria and Turner. Thus, the credibility of both Longoria and Turner was fully and fairly presented for determination by the jury. Indeed, the reason for the custody status of Longoria and Turner was far more damaging to their credibility than the fact of custody. Nevertheless, the jury could consider both the reason for and the fact of their custody status because to do so would not constitute a prohibited credibility determination on the fact of custody, by itself.

Furthermore, the remaining instructions also rendered harmless any possible error in giving CALCRIM No. 337 in this case. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 116 [jury charge considered as a whole].) While the court instructed the jury that the fact that a witness is in custody does not by itself make a witness more or less believable, it also directed the jury, in the same instruction, to evaluate the witness's testimony in light of all the instructions. This included other instructions on how to assess credibility. For example, the court posed the question, "Was the witness's testimony influenced by a

13

factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?" (CALCRIM No. 226.) CALCRIM No. 337 allowed the jury to consider the custodial status of Longoria and Turner in combination with all the other factors bearing on their credibility. (*People v. Mackey, supra*, 233 Cal.App.4th at pp. 114-116.)

We therefore conclude that giving CALCRIM No. 337 was harmless beyond a reasonable doubt, even if giving the instruction under the circumstances of this case was error.

IV

*Denial of Juror Identification Request*

Defendant contends that the trial court erred by denying his request for juror identification information. After trial, defendant obtained information that a male juror may have committed misconduct. The trial court granted defendant's request for information identifying the two males on the jury and the two males who were alternates. When it turned out that none of the males could be identified as a juror who committed misconduct, defendant asked for identifying information on the female jurors. But the trial court denied the request. We conclude the trial court did not abuse its discretion in denying the second request.

"After a verdict is entered, a criminal defendant may 'petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose.' (Code Civ. Proc., § 206, subd. (g).) Code of Civil Procedure section 237, subdivision (b) provides that '[t]he petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.' Absent a showing of good cause for the release of the information, the public interest in the integrity of the jury system and the jurors' right to privacy outweighs the defendant's interest in disclosure. (*People v. Avila* (2006)

14

38 Cal.4th 491, 604; *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096.)" (*People v. McNally* (2015) 236 Cal.App.4th 1419.)

After trial in this case, defendant filed a petition for order disclosing personal juror information under Code of Civil Procedure section 237. He also filed the declaration of defense counsel providing facts on which the petition was based. While defendant was being tried in Department 23, Benjamin Serratos was being tried in Department 21. Serratos's family members, who attended his trial, told defendant's attorney that a male juror from Department 23 had spoken to them twice outside the courtroom. He told them that, in the trial where he was a juror, the defendant killed a man and stole his gold chain. The male juror thought the defendant was guilty and was going to make sure he got a life sentence. The male juror also said that (1) his uncle was a top guy in the FBI, (2) the male juror was a big shot in the Army, (3) his whole family was in the CIA, (4) he could help get Serratos off through help from his uncle in the FBI, and (5) he was in charge of the jurors on that floor of the courthouse. The Serratos family thought his statements were outlandish, but he had a juror's badge. They followed him to Department 23 and saw him sitting in the jury box. The court found sufficient cause to release the identifying information of the four male jurors (two actual jurors and two alternates) that heard the case and granted defendant's petition as to those jurors.

Defendant's investigator contacted the four male jurors, and each of them denied being involved in the discussions described by the Serratos family. So the defense made a supplemental petition to obtain the identifying information for the female jurors. At the hearing on the supplemental petition, defense counsel informed the court that defendant's trial counsel, who had already been replaced by the attorney representing defendant on the petitions for juror information, had represented Serratos in pretrial proceedings but had been fired because the family was not happy with him. Defense counsel at the hearing argued that the Serratos family therefore had no reason to help defendant.

The trial court denied the supplemental petition to obtain identifying information for the female jurors.

The trial court held a hearing on defendant's motion for new trial with live testimony of Serratos family members. Shown pictures of the four male jurors, the Serratos family members could not identify any of them as the male juror they spoke to during trial.

On appeal, defendant asserts the trial court abused its discretion in denying the petition for identifying information for the female jurors. He argues: "The court was presented with a baffling competition between two utterly inconsistent scenarios, neither of which could be dismissed as probably false. On the one hand, two women [from the Serratos family] who had nothing to gain from their revelation voluntarily came forth and gave consistent accounts of their encounter with the mysterious 'juror.'" He continues: "This was thus a case that cried out for further investigation to try to reconcile two seemingly irreconcilable sets of facts."

We disagree. This is not a hard case. The inescapable conclusion the court arrived at is that none of the male jurors in this case was the supposed juror described by the Serratos family members. Pictures of each of the four male jurors (again, two were actual jurors, while two were alternates) were shown to the Serratos family members, and they testified that the supposed juror was not among them. We therefore agree with the trial court that there was no good cause for the supplemental petition because disclosing identifying information for the female jurors was unlikely to lead to information supporting a claim of jury misconduct. The court did not abuse its discretion.

V

*Parole Revocation Fine*

Defendant contends we must strike a parole revocation fine recorded in the minutes because it was not imposed by the court. We agree.

16

On the murder count (count 1), the trial court imposed an indeterminate sentence. And on the robbery count (count 2), the court imposed a determinate term of five years, plus an indeterminate term of 25 years to life for the firearm enhancement. The punishment on count 2 was stayed under section 654. While the court did not impose a parole revocation fine under section 1202.45 in its oral pronouncement, the minutes and abstract of judgment reflect a parole revocation fine. Because the parole revocation fine was not imposed in the trial court's oral pronouncement, it was not imposed at all. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385 [oral pronouncement controls over minutes].) For that reason, the parole revocation fine must be struck from the minutes, and the abstract of judgment must be corrected to reflect the proper judgment.

Additionally, imposing a parole revocation fine would have been erroneous because the trial court did not impose an unstayed determinate term. (*People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185-1186.)

## DISPOSITION

The judgment is affirmed. The trial court is directed to (1) strike the parole revocation fine from the minutes and (2) prepare a corrected abstract of judgment and send it to the Department of Corrections and Rehabilitation.


                                    _____NICHOLSON_____, Acting P. J.


We concur:


_____MAURO_____, J.


_____DUARTE_____, J.


17