Filed 9/30/20  P. v. Dean CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D074371 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN358872) |
| TYLER JAMES DEAN et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Diego County, Richard R. Monroy, Judge.  Reversed and remanded with instructions.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Tyler James Dean.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Garcia.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Ryan Valdez.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

Tyler James Dean, Kevin Garcia, and Ryan Valdez (collectively, the defendants) were convicted of second-degree murder in violation of Penal Code[1] section 187, subdivision (a) and the jury also found true an allegation that the murder was committed for the benefit of a criminal street gang. Valdez was sentenced to 15 years to life; Garcia was sentenced to 15 years to life, with an additional one-year term imposed for a prison prior pursuant to section 667.5, subdivision (b); and Dean was sentenced to 30 years to life, including an enhancement for a strike prior pursuant to section 667, subdivision (b), with an additional one-year term imposed for a prison prior pursuant to section 667.5, subdivision (b).

Dean, Garcia, and Valdez appeal. They assert that their convictions must be reversed because the jury was instructed that it could find them guilty based on the natural and probable consequences theory, which was subsequently eliminated by Senate Bill No. 1437; that the superior court erred by refusing to give the jury an instruction on involuntary manslaughter; that the prosecutor committed prejudicial misconduct; that the evidence was not sufficient to support the convictions; that the superior court erred by denying their motion to access juror contact information to investigate potential juror misconduct; and that the cumulative effect of these errors was prejudicial. In addition, they assert that the superior court erred by imposing certain fines and fees without determining that each had the ability to pay. Finally, Garcia asserts, and the People concede, that his

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

abstract of judgment must be amended to reflect the fact that he was convicted by a jury and to strike a one-year enhancement pursuant to section 667.5, subdivision (b).

We agree with the points the People have conceded and remand with instructions for the superior court to amend the abstracts of judgment for Garcia and Dean. We also agree that the superior court should have at least contacted the remaining jurors and held a hearing pursuant to section 237. We therefore conditionally reverse the judgments and remand the matter to the superior court with instructions for the superior court to do so. We are not persuaded by the remaining arguments and affirm the judgments in all other respects. If further investigation does not reveal prejudicial juror misconduct, the superior court may reinstate the judgments as modified.

FACTUAL AND PROCEDURAL BACKGROUND

Hugh Pettigrew was an African American man in his mid-30's that stood approximately six feet, eight inches tall and weighed approximately 400 pounds. In January 2016, he was staying with his stepmother and a number of other family members in an apartment in Fallbrook.

*The Assault*

On the evening of January 22, 2016, another family member, Russell H.,[2] saw Pettigrew at a nearby McDonald's. Russell bought Pettigrew some food and then returned to the apartment while Pettigrew ate. Pettigrew left McDonald's at approximately 10:34 p.m. and began walking back to the apartment alone.

Around the same time, video surveillance captured three young men arriving in the parking lot of an Albertson's approximately halfway between

_____

[2] In accordance with California Rules of Court, rule 8.90(b), we refer to certain individuals by their first name and last initial, and thereafter by their first name only, to protect their privacy. No disrespect is intended.

the McDonald's and the apartment Pettigrew was walking to. The three men exited the red Honda Civic they were riding in, walked down the street towards Pettigrew, ran across the street towards him, assaulted him, and then ran back to the car in the Albertson's parking lot and left.

Pettigrew managed to return to the apartment and knocked on the door shortly before 11:00 p.m. When the door opened, Pettigrew collapsed onto the floor and said, "Mom, I'm hurt." Russell realized Pettigrew was bleeding and Pettigrew asked if he had been stabbed. Russell lifted Pettigrew's shirt and saw a significant amount of blood around his back and torso. Pettigrew's stepmother attempted to place pressure on the wounds to stop the bleeding and Russell and Pettigrew's sister, who was also at the apartment at the time, each called 911.

Pettigrew told his stepmother that he was "jumped" and said, "[t]hey didn't want to fight me, Mama," "they got me," and "I've been stabbed." She asked who "they" were, and he told her that they were gang members, that there were three or four of them, and that one of them was wearing a hoodie and one was wearing some sort of face covering. Russell also recalled that Pettigrew said, "they got me," that he wanted to just fight but that they did not want to fight, that there were three to five "eses," and that they were wearing hoodies and a mask.

Deputy Sheriff Minami responded to the 911 call at approximately 10:50 p.m. When he arrived, Pettigrew was on his knees, leaning on a chair, yelling, "Don't let me die." Deputy Minami immediately began first aid. He asked Pettigrew if he had any problems with anyone in the area and Pettigrew responded that he did not and that he was just walking home when three or four Hispanic men with masks stabbed him. The paramedics arrived

4

and started treating Pettigrew.  Deputy Minami stayed at the scene and photographed Pettigrew's injuries.

*The Initial Investigation*

After the paramedics took Pettigrew in an ambulance, Deputy Minami followed the blood trail from the apartment to the Albertson's.  Another detective, Jenkins, joined him and took some photographs of the bloodstains.  She also collected a receipt, a marijuana pipe, and a coke bottle from the parking lot near where the bloodstains ended.  She then returned to the apartment and collected articles of clothing that Pettigrew had been wearing, as well as Pettigrew's cell phone.  At this point, Pettigrew was still alive and, thus, the investigation was treated as an assault investigation.

*Pettigrew's Injuries and Resulting Death*

Deputy Harrell accompanied Pettigrew to the hospital in an ambulance.  Pettigrew lost consciousness during the ambulance ride.  He arrived at the hospital in a state of shock and was immediately intubated.  The attending physician noted four stab wounds in and around Pettigrew's right lower chest, a larger wound in his left lower abdomen, and smaller wounds on his left flank, left thigh, and left eye.  The stab wound in the abdomen caused a hernia that had to be surgically repaired and Pettigrew also had extensive bleeding in his right chest.

After Pettigrew was taken into surgery, Deputy Harrell encountered a number of family members in the lobby.  Russell indicated that Pettigrew had told him he was attacked by five individuals that were approximately 17 or 18 years old.

The surgeon was able to successfully repair Pettigrew's hernia, but Pettigrew went into respiratory failure after the surgery.  In addition, there was continued bleeding in Pettigrew's right chest cavity that required

5

additional surgical interventions.  Despite these additional interventions, Pettigrew developed further complications, including a serious heart arrhythmia that eventually led to cardiac arrest.  On February 9, 2016, Pettigrew died from the culmination of the multiple injuries and related complications.

An autopsy revealed multiple sharp force injuries, including eight to Pettigrew's torso and two to his extremities.  There were also incisions from a surgery to repair the hernia caused by one of the sharp force injuries to the abdomen.  Pettigrew had fluid in his lungs and severe lung damage.  The medical examiner concluded that Pettigrew died as a result of the sum total of his injuries and complications that arose from those injuries and ruled the cause of death a homicide.

*The Subsequent Murder Investigation*

After Pettigrew's death, the case became a homicide investigation.

By that time, detectives had collected video surveillance from the McDonald's, Albertson's, and other nearby businesses, including the footage of the three males running across the street towards Pettigrew just prior to the assault.  They identified Garcia and his girlfriend, Jessica V., as being associated with the red Honda Civic that the individuals exited just prior to the assault.

In addition, Deputy Fomby, a school resource officer in Fallbrook, recognized Valdez from the video surveillance.  He obtained video footage from the high school that Valdez attended on the day of the assault.  In the video, Valdez is seen wearing a checkered jacket with a grey hood, similar to the one seen in surveillance footage from later that same evening.

Detectives interviewed Jessica on February 10 and she positively identified Garcia, Dean, and Valdez in photographs from the video

6

surveillance. Detectives located Garcia and Valdez the same day, driving in the red Honda Civic. The car was processed for evidence, and a folding knife was found in the glovebox.

Dean was also contacted that same day. Dean and Garcia were processed by field evidence technicians, including photographs and oral swabs for DNA. Dean had an injury on the inside knuckle of his pinky finger that was photographed. The injury was consistent with a sharp-force trauma and appeared to be partially healed. Valdez was contacted on February 29 and was similarly processed by a field evidence technician.

Dean was contacted again on the afternoon of March 30, 2016, a mile or two from the scene of the stabbing. Law enforcement conducted a pat-down search and found a butterfly knife in Dean's pocket.

*DNA Evidence*

Various members of the San Diego County Sheriff's office also took additional photographs of the blood trail leading up to the apartment where Pettigrew was living and collected swabs from several of the blood stains. The swabs were analyzed for DNA and the DNA was compared to samples from Pettigrew, Garcia, Dean, and Valdez. The DNA from two of the swabs matched the DNA profile from Dean. According to the forensic biologist that performed the testing, the probability of randomly selecting a person that would match the DNA profile obtained from the swabs was approximately 1 in 38 quintillion.

On March 1, 2016, an Albertson's employee found a knife and a lighter on the Albertson's loading dock. The knife was examined for blood stains and fingerprints, but none were found. The knife was swabbed for DNA but there was insufficient DNA to develop a DNA profile.

The knife from the glove box of the red Honda Civic was also examined for blood stains and fingerprints, but none were found. There was sufficient DNA to develop a partial DNA profile. Dean and Valdez were excluded as possible contributors. The forensic biologist concluded Garcia could be included as a possible contributor but there was insufficient DNA to be sure.

*Testimony of Garcia's Girlfriend*

Jessica testified that she heard others refer to Garcia as "Maniac" and was aware that he was involved with a Fallbrook gang. However, they had an agreement that they would not discuss anything gang related. She also knew Dean and Valdez as Garcia's friends and knew that Dean went by "Clear".

She testified that she was with Garcia on January 22, 2016. They were driving around most of the day in her vehicle, a red Honda Civic, and she also had her young child in the backseat. At some point in the evening, Garcia asked her to drive to Fallbrook and, once there, they picked up Dean and Valdez.

After driving around awhile longer, Jessica said that she had to use the restroom, so they stopped at an Albertson's. Garcia, Dean, and Valdez all got out of the car and walked away, and then Jessica got out, took her child out, and took him into Albertson's to use the restroom. Garcia, Dean, and Valdez had not yet returned to the car when she got back. They returned approximately six minutes later. They got into the car and Garcia told Jessica to go.

Finally, Jessica testified that the knife found in the glove compartment of her car was not hers.

8

*Forensic Video Testimony*

A forensic video analyst, Grant Fredericks, synchronized and reviewed the video footage collected from several different surveillance cameras in the area. He also did a pixel tracking analysis, in which he identified and tracked groupings of pixels associated with specific individuals by identifying the specific tonal values created by a combination of color and brightness. Using this system, Fredericks labeled several unique pixel groups in the video surveillance with white, yellow, red, and green arrows (hereinafter, W, Y, R, and G, respectively).

Fredericks identified the individual the detectives had previously identified as Pettigrew leaving the McDonald's at approximately 10:34 p.m. and heading towards the Albertson's. He opined that the images of the pixel group he labeled W were consistent with the images of Pettigrew.

In the Albertson's surveillance, he identified pixel groups Y, R, and G exiting a vehicle along with one other unlabeled pixel grouping. He opined that R was wearing clothing that matched the clothing in the video images of Valdez at high school earlier that same day.

In the video, the unlabeled individual goes towards and eventually enters the Albertson's, while Y, R, and G go in a different direction. Y, R, and G exit the Albertson's surveillance, but three distinct pixel groups with tonal values similar to Y, R, and G are seen on another nearby surveillance camera a minute or two later, at approximately 10:35 p.m. On that video, R continues along the sidewalk, while Y and G go towards the opening of a driveway area. Y and G pixel groups disappear into the darkness and, shortly thereafter, two pixel groups that could not be identified, due to a lack of camera resolution, emerge and follow behind R.

At approximately 10:43 p.m., three unique pixel groups move across the street towards W and all four move back and forth around one another for approximately two minutes, from 10:43 to 10:45 p.m. Fredericks was then able to identify three of the pixel groups as Y, R, and G again, as they moved closer to the camera and proceeded back towards the Albertson's. At this point, Y, R, and G are seen moving at a higher rate of speed than before and appear. They reappear on the Albertson's surveillance approximately 11 and a half minutes after they left.

Meanwhile, at approximately 10:39 p.m., the other pixel group that had exited the vehicle with Y, R, and G left Albertson's and returned to the car, consistent with the time on images from inside Albertson's in which Jessica is seen leaving the store with her child.

*Gang Testimony*

Deputy Banks testified that he contacted Valdez in July 2013 and Valdez stated that he was trying to become a member of the Varrio Fallbrook Locos gang. In addition, he contacted Dean in February 2016 and Dean stated that he was a member of the Varrio Fallbrook Locos gang and that his moniker was "Claro."

Detective Conard testified regarding "fresh" graffiti that had recently been discovered in the Varrio Fallbrook Locos gang territory in June 2016. He explained that the graffiti included common references to the Varrio Fallbrook Locos gang, such as "F" and "13". It also contained a "roll call," which is a reference or intentional grouping of gang member monikers, including "Blanco," Valdez's moniker. He identified a racial comment in the graffiti and testified that the Varrio Fallbrook Locos gang was known to have animosity towards African Americans.

10

Detective Harris testified there were approximately 115 documented members of the Varrio Fallbrook Locos gang in the spring of 2016. He confirmed that the location of Pettigrew's assault was within the Varrio Fallbrook Locos gang's territory and explained that the Varrio Fallbrook Locos gang tended to have animosity towards African Americans. In particular, he had been involved in cases in which members of the Varrio Fallbrook Locos gang had targeted African Americans who were not gang members and opined that a large African American male walking in the gang's territory might be perceived as an act of disrespect against the gang. In addition, he was aware of gang members committing opportunistic crimes, such as attacking a perceived rival seen walking through the gang's territory without having a preconceived plan, and that there would be a perceived benefit to the gang if gang members were to kill an African American in the gang's territory. Finally, based on the totality of the evidence and his training and experience, Harris opined that Dean, Garcia, and Valdez were all members of the Varrio Fallbrook Locos gang.

*Defense*

James Stam, an independent criminalist, conducted his own investigation of the scene of the assault and also reviewed the photographs and evidence submitted by the prosecution. He pointed out a number of errors in the way the blood trail was originally documented and opined that he would have expected to see more significant blood stains on the ground near the area where the prosecution asserted Pettigrew was stabbed.

Pettigrew's sister testified that Pettigrew said he was stabbed by "eses," that they were wearing dark colors and masks, and that there were two or three of them. She also recalled that Pettigrew said it happened in a parking lot. During an interview with a detective in the days following the

11

result, which was played for the jury, she explained that the Fallbrook Locos were known to hang out in front of the apartment and also in the Albertson's parking lot.

None of the defendants testified.

*Verdict and Sentencing*

The jury began deliberations just before noon on December 5, 2017. During deliberations, they sent a note requesting several items, including the reports of the detectives that spoke with Pettigrew, the timeline of the 911 calls, and the transcript of the law enforcement interview of Russell. They continued to deliberate on December 6 and reached a verdict just before noon on December 7. The jury found all three defendants guilty of second-degree murder and found true allegations that the murder was committed for the benefit of a criminal street gang.

The superior court sentenced Valdez to an indeterminate term of 15 years to life; sentenced Garcia to an indeterminate term of 15 years to life plus a one-year enhancement pursuant to section 667.5, subdivision (b); and sentenced Dean to an indeterminate term of 30 years to life plus a one-year enhancement pursuant to section 667.5, subdivision (b).

All three defendants appeal.

DISCUSSION

I. *The Defendants Are Not Entitled to Reversal Based on Senate Bill 1437*

The jury was instructed with CALCRIM 400: Aiding and Abetting: General Principles; CALCRIM 401: Aiding and Abetting: Intended Crimes; and CALCRIM 403: Natural and Probable Consequences. Based in part on these instructions, the prosecution argued that it was reasonably foreseeable to each of the defendants that Pettigrew might be murdered as a result of the

assault and, specifically, that "each of these defendants is guilty of murder under a natural and probable consequences method of aiding and abetting".

The instructions and argument were appropriate under the law as it existed at the time of the trial, in December 2017.  At that time, an aider and abettor with the necessary mental state could be guilty of second-degree murder if the victim's death was a natural and probable consequence of an intended or target crime; in this case, the assault.  (*People v. Chiu* (2014) 59 Cal.4th 155, 158-159 (*Chiu*); *People v. McCoy* (2001) 25 Cal.4th 111, 1117; *People v. Prettyman* (1996) 14 Cal.4th 248, 260.)

However, "[i]n 2018, the Legislature passed and the Governor signed into law Senate Bill No. 1437 (Senate Bill 1437), legislation that prospectively amended the mens rea requirements for the offense of murder and restricted the circumstances under which a person can be liable for murder under the felony-murder rule or the natural and probable consequences doctrine.  (Stats. 2018, ch. 1015.)"  (*People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270, 274.)

Amended section 188 provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  Section 189, as amended, limits murder liability to a person who:  (1) was the actual killer; (2) although not the actual killer, intended to kill and assisted the actual killer in the commission of first-degree murder; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life.  (§ 189, subd. (e).)

"Senate Bill 1437 also established a procedure permitting certain qualifying persons who were previously convicted of felony murder or murder

13

under the natural and probable consequences doctrine to petition the courts that sentenced them to vacate their murder convictions and obtain resentencing on any remaining counts." (*Gooden*, *supra*, 42 Cal.App.5th at p. 274.) That procedure is set forth in section 1170.95.

The parties in this case agree that Senate Bill 1437 is retroactive but disagree whether the defendants are entitled to relief on appeal as a result. Specifically, the People assert section 1170.95 is the exclusive means for the defendants to obtain relief. We agree.

In *People v. Martinez*, the appellate court conducted a detailed analysis of Senate Bill 1437 and concluded that, by virtue of including the section 1170.95 petition process therein, the Legislature intended for that process to provide the exclusive means to obtain relief post-conviction, including cases where the convictions are not yet final. (*People v. Martinez* (2019) 31 Cal.App.5th 719 (*Martinez*), rev. and depub. request denied May 1, 2019, No. S25428; see also *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1148-1158 (*Anthony*) [adopting the reasoning in *Martinez*]). We agree with the analysis by the *Martinez* court and therefore reject the defendants' arguments that they are entitled to the consideration of the merits of their Senate Bill 1437 claims in this appeal. The defendants contend *Martinez* was wrongly decided but we do not find their arguments in that regard persuasive and note that the California Supreme Court denied a petition for review and request for depublication.

The defendants assert that the court in *Martinez* relied on cases that involved simple resentencing amendments while Senate Bill 1437 changed what is required to prove the crime of murder, thereby implicating fundamental rights. *Martinez* relied primarily on the California Supreme Court's decision in *People v. Conley* (2016) 63 Cal.4th 646 (*Conley*), which

14

addressed Proposition 36, and *People v. DeHoyos* (2018) 4 Cal.5th 594 (*DeHoyos*), which addressed Proposition 47. As an initial matter, we note that Proposition 47 reclassified certain offenses from felonies to misdemeanors and, thus, also represents a fundamental change in law. (*DeHoyos*, at pp. 603-604.) Regardless, the substantive nature of the amendments is not significant to the retroactivity analysis where, as here and in *Conley* and *DeHoyos*, the Legislature has explicitly provided a procedure for those individuals previously convicted under the prior law. (See *Martinez, supra*, 31 Cal.App.5th at pp. 724-729 [addressing a similar contention and finding *Conley* and *DeHoyos* to be instructive]; *Anthony, supra*, 32 Cal.App.5th at p. 1153.) Accordingly, we find no error in the *Martinez* court's reliance on *Conley* and *DeHoyos*.

The defendants also contend Senate Bill 1437 does not explicitly indicate that the petition procedure is the exclusive remedy, and thus does not preclude their right to raise their claims on direct appeal. The court in *Martinez* rejected a similar argument, stating "there is no indication that reversal of a defendant's sentence on direct appeal without compliance with the procedures outlined in section 1170.95 was among the 'rights' the Legislature sought to preserve in enacting Senate Bill 1437." (*Martinez, supra*, 31 Cal.App.5th at p. 729.) Once again, we agree with the *Martinez* court's analysis.

Relying on *Chiu, supra*, 59 Cal.4th 155 and *People v. Chun* (2009) 45 Cal.4th 1172 (*Chun*), the defendants assert the usual remedy when the jury is instructed on a theory of liability that is later deemed invalid based on a change in the law, is reversal of the defendant's conviction. (See *Chiu*, at pp. 167-168, *Chun*, at p. 1203.) They argue they should not have to forego that remedy, and the associated Sixth Amendment right to a jury trial, in

15

order to pursue resentencing under section 1170.95. *Chiu* and *Chun* are not applicable here, though, as those cases dealt with legally invalid theories of liability, as opposed to a legislative decision to change the statutory definition of a particular crime. (Compare *Chiu*, at pp. 158-159 ["We now hold that an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine"]; *Chun*, at p. 1178 ["We will overrule some of our decisions and hold that all assaultive-type crimes, such as a violation of section 246, merge with the charged homicide and cannot be the basis for a second degree felony-murder instruction"]; *Gooden, supra*, 42 Cal.App.5th at p. 274.) The retroactive relief afforded by Senate Bill 1437 does not implicate and is not subject to a Sixth Amendment analysis. (See *Anthony, supra,* 32 Cal.App.5th at p. 1156; see also *People v. Perez* (2018) 4 Cal.5th 1055, 1063-1064 ["We hold that the Sixth Amendment does not prohibit trial courts from relying on facts not found by a jury in determining applicability of Proposition 36's resentencing ineligibility criteria."].)

Finally, Garcia asserts he should not have to "choose" between an appeal and a remedy pursuant to section 1170.95, but nothing in section 1170.95 precludes him from filing both. (See *Anthony, supra,* 32 Cal.App.5th at p. 1156 ["That defendants must wait until the resolution of their appeal before pursuing their petition does not deprive them of a remedy."].) Further, nothing in this decision restricts any rights any appellant may have under Senate Bill No. 1437 to petition the superior court for relief.

II. *The Superior Court Did Not Err by Declining to Give an Involuntary Manslaughter Instruction*

Dean and Garcia assert the superior court erred by denying their request to provide a jury instruction on involuntary manslaughter. Valdez

does not directly raise such an argument but joins in any arguments that may accrue to his benefit.

Both voluntary and involuntary manslaughter are lesser included offenses of murder and both involve the unlawful killing of another without malice. (*People v. Thomas* (2012) 53 Cal.4th 771, 813; *People v. Beltran* (2013) 56 Cal.4th 935, 942; (§ 192, subds. (a), (b).) Voluntary manslaughter is a killing without malice "upon a sudden quarrel or heat of passion" or in imperfect self-defense. (§ 192, subd. (a); *People v. Simon* (2016) 1 Cal.5th 98, 132.) Involuntary manslaughter is a killing without malice by committing "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b); *People v. Cook* (2006) 39 Cal.4th 566, 596 (*Cook*).) "Malice is implied, however, when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (*Cook*, at p. 596.)

We conduct an independent, de novo review when considering whether the superior court should have provided the jury with an instruction on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.) "An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense." (*People v. Nelson* (2016) 1 Cal.5th 513, 538.)

Here, the jury was instructed on voluntary manslaughter. The defense also requested an instruction on involuntary manslaughter based on a theory that Pettigrew's death was the result of a misdemeanor gone awry. The superior court stated it could not "fathom a set of circumstances" for

17

involuntary manslaughter and declined to give the instruction. We find no error in the superior court's refusal.

The defendants argue, essentially, that Pettigrew was large, and the evidence indicated he was stabbed with one or more comparatively "small knives." Based on this evidence, they assert the jury could have concluded they committed a simple assault in a reckless manner and/or that they intended only to harass, but not kill, Pettigrew.

The extent of Pettigrew's injuries directly contradicts this theory. Pettigrew was stabbed eight times in his torso and twice in his extremities; this included four stab wounds to his lower chest and a large abdominal wound. As a result of his injuries, he lost consciousness, went into shock, and had to be intubated immediately upon arrival to the hospital. The abdominal wound caused a hernia that had to be surgically repaired and the chest wounds caused extensive internal bleeding.

Stabbing an individual in the chest and abdomen multiple times is an intentional act, the natural consequences of which are dangerous to human life, and there was no evidence suggesting the defendants did not have a subjective understanding of the risk to human life their conduct posed. (See *Cook*, *supra*, 39 Cal.4th at p. 596; *People v. Brothers* (2015) 236 Cal.App.4th 24, 34-35; *People v. Guillen* (2014) 227 Cal.App.4th 934, 1028.) Further, as in *Cook*—where the appellant repeatedly beat the victim's head with a board— there was no evidence here to suggest that it was simply an "unlucky blow" that caused Pettigrew's death. (*Cook*, *supra*, 39 Cal.4th at p. 597.) Instead, the evidence indicated one or more of the defendants intentionally and repetitively stabbed Pettigrew in the chest and abdomen. For these reasons, we conclude there was not substantial evidence to support an involuntary

manslaughter instruction and the superior court did not err by declining to give the instruction.

Moreover, even if we were to conclude, which we do not, that the court erred by declining to instruct the jury on involuntary manslaughter, any error was harmless. The court did instruct the jury on voluntary manslaughter, which requires a higher degree of culpability than involuntary manslaughter, and the jury rejected that theory and found the defendants guilty of murder. In addition, the jury found true the gang allegation, indicating their belief that the defendants stabbed Pettigrew with the specific intent of benefiting the Varrio Fallbrook Locos gang. Thus, "there is no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option." (*People v. Rogers* (2006) 39 Cal.4th 826, 884; *Cook, supra,* 39 Cal.4th at p. 597.)

The defendants assert the voluntary manslaughter instruction required the jury to believe the defendants subjectively believed they needed to defend themselves, while the involuntary manslaughter instruction would not have required such a finding. However, there was no more evidence to suggest the defendants only intended to harass Pettigrew than there was to suggest the defendants acted in self-defense.

III. *The Prosecutor Did Not Commit Prejudicial Misconduct*

Valdez asserts, and the other defendants join, that the prosecutor committed prejudicial misconduct based on the following exchange between the prosecutor and the lead homicide detective:

19

Q: With respect to evidence processing and evidence viewing, that's a process that's something that's available to all the parties of a litigation; is that right?

A: Yes.

Q: Anybody can look at it, anybody can have it tested?

Before the detective could answer, defense counsel objected and requested a sidebar. At the sidebar, defense counsel argued the prosecutor was improperly shifting the burden. The prosecutor responded that it was merely a procedural question and pointed out that she had not identified anyone specific that had or had not looked at the evidence. The court agreed that the question as stated was permissible but cautioned that "anything beyond this starts to bump up against the potential of burden shifting." Defense counsel asked for an instruction to the jury and the court declined. However, the court did sustain the objection to the second question. Given the court's admonition, the prosecutor immediately moved on to a different topic.

A prosecutor may comment on the state of the evidence and may question the defense's failure to call logical witnesses or introduce material evidence. (*People v. Woods* (2006) 146 Cal.App.4th 106, 112.) However, a prosecutor commits misconduct when he or she attempts to lessen the prosecution's burden to prove their case beyond a reasonable doubt or otherwise suggests that any shortcomings in the prosecution's case are mitigated by deficiencies in the defense case. (*People v. Centeno* (2014) 60 Cal.4th 659, 666, 673.) "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to

20

produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)

A prosecutor need not act in bad faith to commit misconduct, but the defendant must have been prejudiced as a result. (*People v. Bolton* (1979) 23 Cal.3d 208, 213-214.) "A prosecutor's conduct violates the federal Constitution when it infects the trial with unfairness, and violates state law if it involves the use of deceptive or reprehensible methods of persuasion." (*People v. Booker* (2011) 51 Cal.4th 141, 184.) An error born out of state law does not require reversal "unless it is reasonably probable the result would have been more favorable to the defendant in the absence of the misconduct." (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 [concluding a prosecutor's burden-shifting remarks were harmless].)

Here, the prosecutor's questions did not rise to the level of prejudicial misconduct. As the superior court aptly noted, the first question was procedural. The prosecutor did not suggest the defendants failed to conduct any particular testing or that they had any obligation to test the evidence. (See *Cook, supra*, 39 Cal.4th at p. 607 ["Pointing out that contested physical evidence could be retested does not shift the burden of proof."].) Regardless, the court cautioned the prosecutor that the line of questioning was approaching impermissible burden shifting, sustained the objection to the second question, and asked the prosecutor to move on, which she did. An instruction was not necessary at this point because the prosecutor had not yet crossed the line into improper burden shifting.

Moreover, even if the questions did suggest the defendants should have conducted their own testing, the questions were not sufficiently prejudicial to require reversal. At most the prosecutor asked two allegedly impermissible questions, one of which the witness did not answer. By contrast, the trial

spanned approximately 14 days and included testimony from several detectives and experts in the field of forensic testing, as well as video surveillance depicting the assault and additional associated expert testimony. The jury was instructed as to the appropriate burdens of proof, including an instruction on reasonable doubt pursuant to CALCRIM No. 220, and the defendants do not allege that the prosecutor contradicted those instructions in her closing argument or at any other point during the trial. In the absence of any evidence to the contrary, we presume the jury understood and followed the court's instruction. (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9.)

IV. *The Evidence Was Sufficient to Support the Verdicts*

Valdez asserts, and Garcia joins, that the evidence was insufficient to support the jury's verdict finding him guilty of second-degree murder.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60, citations omitted.)

Here, Valdez argues there was no evidence he was a direct perpetrator or an aider or abettor. To aid and abet, there must be evidence the defendant encouraged or facilitated commission of an offense by another with

22

knowledge of the criminal purpose of the perpetrator.  (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)  One who aids and abets in the commission of a crime is not only liable for that crime but for probable consequences of the crime originally aided.  (*People v. Prettyman* (1996) 14 Cal.4th 248, 254; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117.)  Given the evidence here, it was reasonable for the jury to find that Valdez took part in the assault against Pettigrew, at least as an aider and abettor, and that the murder was a probable consequence of the assault.

Valdez was identified on the footage from the surveillance video exiting the car with Dean and Garcia, walking towards Pettigrew with the group, and retreating after the assault.  The video itself shows the three individuals, previously identified as Valdez, Garcia, and Dean, interacting with Pettigrew and then running away.  Although it is not clear enough to decipher which of the individuals actually stabbed Pettigrew, it would be reasonable for the jurors, watching the video and considering Fredericks' associated testimony, to conclude that all three individuals were actively involved in the assault. On the other hand, there was no evidence to suggest Valdez, or Garcia or Dean for that matter, had not participated.

There was also evidence that Valdez, Garcia, and Dean were all members of the same gang, that the assault took place in gang territory, and that an African American walking through the gang's territory would be seen as an act of disrespect against the gang.  Valdez argues that evidence of gang membership is not sufficient to establish intent or facilitation of murder (see *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, 1342; *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 940-941), but the evidence here went beyond mere gang membership.  The evidence also showed that Valdez,

Garcia, and Dean were together and acted in concert on the evening of the assault and provided a potential motive for the assault.

Finally, the evidence suggested that Pettigrew was alone and unarmed and that the attackers were armed with one or more knives.[3] It was reasonable, based on the totality of the evidence, for the jury to find that Valdez was, at a minimum, aiding and abetting the assault, and that it was reasonably foreseeable that Pettigrew would die as a result of the assault. (See *Albillar, supra,* 51 Cal.4th at p. 60.) The same is true for Garcia.

Valdez argues this case is like *People v. Rodriguez* (1986) 42 Cal.3d 730 (*Rodriguez*) and *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262 (*Juan H.*), but neither are instructive here. In *Rodriguez*, the court found the defendant's mere presence in a car and inaction when the driver got out and shot a police officer was not sufficient to establish that she was an accomplice, or aider and abettor, in a murder. (*Rodriguez*, at pp. 760-761.) By contrast here, the evidence indicated Valdez left the vehicle and pursued Pettigrew along with Dean and Garcia. In *Juan H.*, the court found that the evidence was not sufficient to convict the defendant of aiding and abetting first-degree murder because the evidence did not establish that Juan had the requisite knowledge or intent. (*Juan H.*, at pp. 1278-1279.) Here, Valdez was convicted of second, not first, degree murder, likely based on a natural and probable consequences theory.

Valdez asserts that the natural and probable consequences theory can no longer be used to convict a defendant of second-degree murder. We addressed this issue, *ante*, in Section I and concluded that section 1170.95 is

---

[3] Valdez asserts there is no evidence that he had a knife himself, but at least one individual did as Pettigrew was stabbed, and it was reasonable for the jury to conclude from the evidence presented that Valdez either knew or had reason to believe that one or more of his associates was armed.

24

the exclusive means for the defendants to obtain relief pursuant to the amendments set forth in Senate Bill 1437. The defendants cannot circumvent the section 1170.95 petition process by bootstrapping their Senate Bill 1437 argument to a sufficiency of the evidence argument that relies upon the Senate Bill 1437 amendments that were not in place at the time of trial. (See *Brown*, *supra*, 230 Cal.App.4th 1511-1512.)

## V. *Superior Court Erred by Denying Defendants' Motion for Disclosure of Jury*

The defendants assert the superior court erred by denying their request to issue an order disclosing jurors' contact information without notifying all of the jurors. On this point, we agree.

### A. *Additional Background*

None of the defendants testified on their own behalf at trial. As is standard, the jurors were instructed with CALCRIM 355, which states, in part, that a defendant "has an absolute constitutional right not to testify . . . [d]o not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way." Despite this instruction, there was at least some indication that one or more of the jurors did consider the fact that the defendants did not testify in their deliberations.

After the jury delivered its verdict, and with the consent of the court, Public Defender Investigator David Martinez spoke with any willing jurors about their deliberations and overall experience. During that conversation, Juror No. 4 indicated the jurors had discussed the fact that the defendants did not testify and that it may have had an impact on their deliberations. Thereafter, the defendants filed a request for an order from the superior court disclosing the jurors' addresses and phone numbers, so they could

25

contact the jurors and, if appropriate, file a motion for a new trial based on juror misconduct.

In support of their motion, the defendants provided declarations from Martinez and Valdez's trial attorney. Martinez declared that Juror No. 4 indicated that "an unspecified number of other jurors discussed the fact that the defendants did not testify, and it had an impact on the jury's verdict." He further declared that Juror No. 4 returned to the courthouse later that day and asked him for his notes from the interview. When he refused to give her his notes, she asked to speak with the judge. Valdez's attorney declared that he was also present when Juror No. 4 "stated that she and other jurors violated the court's instruction to not consider Mr. Valdez's decision not to testify at trial" and that "she and other jurors discussed Mr. Valdez's decision not to testify." He further declared, "I am informed and believe that Juror No.4 and other jurors (if not all) vote was affected by Mr. Valdez's decision not to testify."

In response, the People submitted a declaration from their own investigator, Richard Anderson. He asserted he "heard Juror Number 4 say that some jurors had 'wondered' why the defendants didn't testify but that it had no bearing on the verdict." He then informed Juror No. 4 "that her comments may be used by the defense in a motion or she may have to testify under oath about her comments to the defense. Juror No. 4 became upset and asked what she said 'wrong.'" Anderson further declared that Juror No. 4 called him the next day, asked him to remind her of what she had said, and then stated that the jury did not take the fact that the defendants did not testify into consideration. Finally, he declared another juror had separately reached out to the prosecutor after the trial and had agreed to provide a

26

sworn affidavit indicating that the jurors did not consider the defendants' failure to testify in their deliberations.

The prosecutor submitted a declaration in which she confirmed that Juror No. 11 had reached out to her to discuss potential career paths, and that she had taken the opportunity to ask Juror No. 11 about the deliberations. Juror No. 11 submitted a sworn affidavit stating: "I served as juror foreperson during jury deliberations"; "Although the subject of the defendants not testifying did not come up during deliberations, if it had I would have instructed any juror raising the subject that it could not be considered by us in our deliberations. If any juror persisted, I would have alerted the court" and "Since there was no discussion during deliberations regarding the defendants not testifying, that information did not impact my verdict in this case."

On April 5, 2018, the People filed a supplemental response, which included a declaration from Juror No. 12. The prosecutor indicated Juror No. 12 had attended a sentencing hearing and had agreed to speak with her and her investigator after the hearing. In the declaration, Juror No. 12 stated, "[t]he subject of the defendants not testifying in trial did not come up and was not discussed at all during jury deliberations," and "[s]ince there was no discussion during deliberations regarding the defendants not testifying, that information did not impact my verdict in this case."

At a hearing in May, the superior court indicated it intended to "at least notice Juror [Number] 4," as her statements were at the heart of the discrepancies between the declarations submitted by the two sides. Thereafter, in June, the People submitted another supplemental response with an affidavit from Juror No. 4, which stated, in part: "The subject of the defendants not testifying in trial was mentioned by a juror other than

27

myself"; and "The subject was immediately shut down and the jury did not discuss the subject further in its deliberations."

On June 15, the superior court indicated it had received a response from Juror No. 4, on May 31, objecting to the release of her information. Given the declaration submitted by Juror No. 4, the court concluded there was insufficient information to suggest juror misconduct and denied the request to disclose either Juror No. 4 or any of the other jurors' information.

### B. *Relevant Legal Principles*

Pursuant to Code of Civil Procedure section 206, subdivision (g), "a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (*Ibid.*; *People v. McNally* (2015) 236 Cal.App.4th 1419, 1430 (*McNally*).)

Code of Civil Procedure section 237 sets forth the procedure for handling such petitions and specifies that the petition "shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." (*Id.*, subd. (b); *McNally*, *supra*, 236 Cal.App.4th at p. 1430.) It further provides, "[t]he court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure." (Code Civ. Proc., § 237, subd. (b).) If a hearing is set, the court "shall provide notice to each affected former juror" and any notified

28

juror "may appear in person, in writing, by telephone, or by counsel to protest the granting of the petition."  (Code Civ. Proc., § 237, subd. (c).)

"Absent a showing of good cause for the release of the information, the public interest in the integrity of the jury system and the jurors' right to privacy outweighs the defendant's interest in disclosure."  (*McNally*, *supra*, 236 Cal.App.4th at p. 1430.)

On appeal, we review the superior court's order denying the request for abuse of discretion.  (*People v. Jones* (1998) 17 Cal.4th 279, 317.)

*C.  Analysis*

Here, we conclude the superior court abused its discretion by failing to notify all of the jurors of the request, despite a prima facie showing of misconduct.  (See Code Civ. Proc., § 237, subd. (c).)

The defense presented two sworn affidavits indicating that Juror No. 4 disclosed, immediately after trial, that an unspecified number of jurors discussed the fact that the defendants did not testify.  If the members of the jury did in fact consider the defendants' failure to testify in reaching their verdict, it likely constituted prejudicial misconduct.[4]  (See *People v. Lavender* (2014) 60 Cal. 4th 679, 687.)

The superior court relied on the subsequent declaration of Juror No. 4, essentially recanting her previous statements, but that declaration was made only after Juror No. 4 expressed concern that her statement could be used by

_____

[4]     The People argue that fleeting discussions of the fact that the defendants did not testify would not have been prejudicial misconduct.  (See, e.g., *People v. Leonard* (2007) 40 Cal.4th 1370, 1424-1425 [addressing the trial court's ruling on a motion for a new trial based on alleged juror misconduct].)  The issue here, though, is simply whether the defendants had made a prima facie showing of potential misconduct to support their request for the disclosure of juror information.  As discussed herein, further inquiry may have revealed whether the discussion was in fact fleeting or more robust and, thus, prejudicial.

the defense and that she may have to further testify under oath. (See *People v. Tuggles* (2009) 179 Cal.App.4th 339, 387 (*Tuggles*) ["Jurors may not thwart an investigation of misconduct by the court itself."].) The People argue the superior court could have disregarded the earlier non-juror declarations as unreliable hearsay, but there is no indication in the record that the court actually did so (see *Id*. at pp. 385-386). Indeed, the court found sufficient basis from those declarations to at least notify Juror No. 4 of the request and, as noted, by the time Juror No. 4 submitted the subsequent declaration, there was ample evidence that she was at least reluctant to participate further. (See *Id*. at p. 387; *People v. Johnson* (2013) 222 Cal.App.4th 486, 495 [finding similar out of court statements admissible in the context of making a prima facie showing of misconduct]; Evid. Code, § 1150.) Moreover, even the subsequent declaration indicated that the topic of the defendants not testifying was mentioned by at least one other juror.

The superior court also relied on the declarations from Jurors No. 11 and 12 but those also were not conclusive evidence that there was no misconduct. Juror No. 4 indicated that at least one juror, or an unspecified number of jurors, discussed the fact that the defendants did not testify. She did not indicate that the discussion happened in the jury room or in the presence of all of the other jurors. Jurors No. 11 and 12 indicated they did not hear any such discussions but, as the defense pointed out, that left nine other jurors that may have discussed or heard others discussing the fact that the defendants did not testify. Further, the declarations of Jurors No. 11 and 12 were inconsistent with the second declaration from Juror No. 4 insofar as Jurors No. 11 and 12 indicated that no one discussed the fact that the defendants did not testify but Juror No. 4 indicated the topic did come up but was shut down.

The court stated it had information from the jurors that the fact that the defendants did not testify did not play a role in their ultimate decision, but the court only had such information from three out of 12 jurors, and even that information was not consistent. Moreover, the court indicated it was "balancing" the defendants' interest in a fair trial against the jurors' interest in their own privacy. That was premature, however, as the court had not notified the other jurors of the request and thus had no way to know whether they would object. (See § 237, subd. (b) ["If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure."], *id.* subd. (c) ["If a hearing is set . . . [t]he court shall provide notice to each affected former juror . . . [and] [a]ny affected former juror may appear"].)

The superior court did notify Juror No. 4 and she did object to the disclosure of her information, but the court did not notice the remaining jurors despite the fact that the defendants' requested the disclosure of information for all of the jurors. (Code Civ. Proc., § 237, subd. (c).) Had the court notified all of the jurors, it is possible that other jurors would have been willing to provide additional information. If the jurors objected to the disclosure of their information, the court could have considered those objections, as provided in section 237. In addition, even if the superior court ultimately did not disclose the personal information of the jurors, it could still

order them to appear at a hearing to answer questions about whether the misconduct occurred. (See *Tuggles*, *supra*, 179 Cal.App.4th at pp. 385-386.)[5]

Thus, at a minimum, the superior court should have notified all 12 jurors of the request and then held a hearing, pursuant to Code of Civil Procedure section 237, subdivision (c). Because the court failed to do so, we conclude the court abused its discretion in denying the defendants' request. We therefore conditionally reverse the judgments and remand the matter back to the superior court with instructions to notify all 12 jurors of the defendants' request and to hold a hearing, pursuant to Code of Civil Procedure section 237, subdivision (c). The court may then proceed as appropriate in light of the jurors' responses. If the superior court ultimately determines that further disclosure is not appropriate, or that there was no misconduct, the original judgments may be reinstated, subject to the modifications discussed *post* in sections VIII and IX.

VI. *No Cumulative Error*

The defendants assert, even if no single error is sufficient to require reversal, reversal is required due to the cumulative effect of the asserted errors. The cumulative error doctrine applies when "the cumulative effect of the errors . . . makes[s] it 'reasonably probable that a result more favorable to

---

5     Garcia also asserts the superior court violated the defendants' rights to due process by relying on declarations procured by the prosecutor without permitting the defendants to speak with those same jurors. To the contrary, the defendants were permitted to speak to the jurors after the verdict, and did speak to Juror No. 4, but failed to acquire their own declaration from her. Regardless, we have concluded herein that the subsequent declarations from Jurors No. 4, 11, and 12 were not sufficient to rebut the prima facie showing of potential misconduct and therefore conditionally reverse and remand the matter for further proceedings consistent with section 237. Accordingly, we need not, and expressly do not, reach Garcia's due process assertions.

the appealing party would have been reached in the absence of the error[s].' " (*Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 141.)

However, we have found no individual errors other than the superior court's denial of the defendant's request to disclose the juror information without the appropriate notice and hearing, and we have conditionally reversed the judgments on that ground. As we have found no other individual errors, we conclude there is no cumulative error.

## VII. *Defendants Forfeited Any Arguments under Duenas*

At sentencing, the superior court imposed restitution fines pursuant to Penal Code section 1202.4, subdivision (b) of $4,500 on Valdez, $10,000 on Dean, and $4,800 on Garcia, along with corresponding suspended restitution fines pursuant to section 1202.45. In addition, the court imposed court security fees pursuant to Penal Code section 1465.8 in the amount of $40 on Valdez and Dean, and $120 on Garcia, and criminal conviction assessments pursuant to Government Code section 70373 in the amount of $30 on Valdez and Dean, and $90 on Garcia.

In January 2019, while the present appeal was pending, the Second Appellate District issued its opinion in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). Therein, the court concluded that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373" and that, "although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the

defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164.)

The defendants now assert, in reliance on *Dueñas*, that the imposition of the above-listed fines and fees without any findings regarding their ability to pay those fines and fees violated their right to due process. In *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, the court concluded that a similar challenge to imposed fees and fines was forfeited because the defendant had every incentive to object to the imposition of a restitution fine that exceeded the statutory minimum based on inability to pay, and the statute (§ 1202.4, subd. (c)) expressly permitted such a challenge, but the defendant failed to make such an objection. (*Gutierrez*, at p. 1033.) The court also stated, "[a]s a practical matter, if Gutierrez chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees." (*Ibid.*)

Applying that same reasoning to the case at hand, we conclude the defendants forfeited their arguments under *Dueñas* by failing to assert an inability to pay objection when the superior court imposed restitution fines on each of them exceeding the statutory minimum. (See also, *People v. Jenkins* (2019) 40 Cal.App.5th 30, 39-41 [*Dueñas* arguments forfeited where defendant did not object to statutory maximum restitution fee]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1059, 1061 [same]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1154 [same].)

Finally, even if we were to address the merits, we would find no constitutional error under *Dueñas*. The validity of the court's decision in *Dueñas* has been questioned in several subsequent opinions. (See, e.g., *People v. Allen* (2019) 41 Cal.App.5th 312, 318, 326-327 [discussing several other cases and rejecting the analysis in *Dueñas*].) Most notably, the court in

*Dueñas* based its due process analysis on a right of access to the courts and a bar to incarceration based on the failure to pay criminal penalties when that failure is not willful. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1165-1169; *People v. Hicks* (2019) 40 Cal.App.5th 320, 325, rev. granted Nov. 26, 2019 (S258946); *Allen*, *supra*, 41 Cal.App.5th at pp. 326-328; *People v. Caceres* (2019) 39 Cal.App.5th 917, 927.)[6] In the present case, the defendants were not denied access to the courts and the incarceration that was imposed was not based on their failure to pay fines. Accordingly, *Dueñas* is not applicable. (See *Hicks*, at pp. 329; *Allen*, at p. 327; *Caceres*, at pp. 926-928.)

VIII. *Section 667.5 Enhancements Must be Stricken*

Prior to January 1, 2020, Penal Code section 667.5, subdivision (b) required trial courts to impose a one-year sentence enhancement for each true finding on an allegation the defendant served a separate prior prison term and had not remained free of custody for at least five years. (Former Pen. Code, § 667.5, subd. (b).) Effective January 1, 2020, Senate Bill 136 amended section 667.5, subdivision (b) by limiting the one-year enhancement to prior prison terms to sexually violent offenses, as defined by Welfare and Institutions Code, section 6600, subdivision (b). (§ 667.5, subd. (b); Stats. 2019, ch. 590, § 1.)

Here, Garcia admitted a prison prior for a previous felony conviction for illegal possession of a firearm pursuant to section 29820. The superior court imposed a one-year sentence enhancement pursuant to section 667.5, subdivision (b). The prior offense was not a sexually violent offense, as defined by Welfare and Institutions Code, section 6600, subdivision (b).

---

[6] We cite *Hicks* for its persuasive value in accordance with California Rules of Court, rule 8.1115(e)(1).

In supplemental briefing, Garcia contends, and the People concede, that the amendments to section 667.5 are retroactive and the retroactivity applies to him as his appeal was not yet final when the amendments became effective on January 1, 2020.  We agree.  (See *In re Estrada* (1965) 63 Cal.2d 740, 745 [discussing retroactivity]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 728-729 [finding Senate Bill No. 136 retroactive under *Estrada*].)

In addition, although he does not specifically raise the issue, Dean does join in all arguments that may accrue to his benefit.  He also admitted a prison prior for assault and battery pursuant to section 245, subdivision (a)(1) and the court also imposed a one-year sentence enhancement pursuant to Penal Code section 667.5, subdivision (b) on his sentence.  That prior offense also was not a sexually violent offense, as defined by Welfare and Institutions Code, section 6600, subdivision (b) and, therefore, should also be stricken.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185-187 (*Mitchell*) [judicial economy is served by appellate court's inherent authority to correct clerical errors in an abstract of judgment even in the absence of a request by the party].)

We therefore strike the section 667.5, subdivision (b) enhancement from Garcia's and Dean's sentences.

IX. *Garcia's Abstract of Judgment Must be Amended*

As a final matter, Garcia contends, and the People concede, that his abstract of judgment should be corrected to reflect that his conviction for second-degree murder resulted from a jury trial and not a guilty plea.

We agree and direct the superior court to modify the abstract of judgment accordingly.  (See *Mitchell, supra,* 26 Cal.4th at p. 185.)

36

## DISPOSITION

The judgments are conditionally reversed, and the matter is remanded to the superior court with instructions for the court to notify all jurors of the defendant's request to disclose information and to conduct an appropriate hearing in accordance with section 237 and this opinion. If no misconduct is found, the judgments may be reinstated as modified.

If reinstated, we direct the superior court to correct Garcia's abstract of judgment to strike the one-year enhancement pursuant to section 667.5, subdivision (b) and to clarify that Garcia was convicted by a jury, and to correct Dean's abstract of judgment to strike the one-year enhancement pursuant to section 667.5, subdivision (b).

In all other regards, the judgments are affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:



HALLER, J.



IRION, J.

37